## CITY OF READING v. RAE.

No. 6891.

Circuit Court of Appeals, Third Circuit.

July 31, 1939.

Writ of Certiorari Denied Nov. 6, 1939.

See 60 S.Ct. 145, 84 L.Ed. ——.

Robert T. McCracken and Samuel Fessenden, both of Philadelphia, Pa., and Darlington Hoopes, of Reading, Pa., for appellant.

John B. Stevens, of Reading, Pa., Roy G. Bostwick, Kenneth G. Jackson, and Thorp, Bostwick, Reed & Armstrong, all of Pittsburgh, Pa., for appellee.

Before BIGGS and CLARK, Circuit Judges, and DICKINSON, District Judge.

BIGGS, Circuit Judge.

The appellant, City of Reading, and the appellee, Rae, entered into a written contract upon April 5, 1934 whereby the appellee agreed to construct for the City a water-supply tunnel approximately twenty-eight hundred feet long. About one-sixth of the tunnel was to be constructed by the open cut method; the balance, by actual tunneling operations. The location and character of the work to be done was shown by plans, numbered one to six inclusive, prepared by the appellant and submitted by it to bidders. One of these plans, No. 3, showed a profile of the proposed construction and borings, indicating the diverse elevations at which solid limestone should be encountered. The borings drawing on Sheet 3 also purported to show the location of mud seams and the sub-surface conditions which would be encountered. This drawing indicated that solid limestone existed at the tunnel level. Sheet 3 also showed an assumed rock line, which we will refer to at a later point. The borings themselves in core boxes were available for the inspection of bidders. Sheet 2 showed the line of borings and the line of the tunnel. The borings line intersected the proposed line of the tunnel near its north end and was at a distance of about one hundred fifty-five feet at the extreme south end. We have attached Sheets 2 and 3 as an appendix to this opinion.

The representations made by the appellant to the appellee are summed up in the fourteenth paragraph of the appellee's statement of claim, which states that, "Said profile and borings as shown on Sheet No. 3 of said plans indicated and represented that solid rock would be encountered at approximately station 62 between elevation 303 and elevation 307; and that from said elevations down to and below elevation 240, and at approximately said station 62, solid limestone would be encountered the entire distance to and below the bottom of said tunnel, and that said water tunnel, if constructed according to said contract, specifications and plans (sic); and further, that said tunnel throughout the entire length thereof, except between stations 71 00 and 73 00, would be constructed in solid limestone. According to the custom and trade in the general contracting business, and more particularly in the business of tunnel and excavation contracting, the statements, markings and representations on said plans and drawings, including sheets numbers 2, 3 and 4 thereof, meant and were intended to mean, to all bidders and to anyone taking the contract for the work to be done under said plans and drawings, that solid limestone would be encountered and said tunnel would be constructed in solid limestone, as in this paragraph averred. And plaintiff avers that the engineer and agents for defendant knew, when they prepared or caused to be prepared said plans and drawings, that the physical conditions of the locality for said tunnel did not conform to the representations thereof on said plans and drawings, but were, on the contrary, false and fraudulent."

The appellee having entered into the contract, proceeded with the work. He sank a shaft about midway the line of the tunnel to the tunnel level and then proceeded to drive headings toward each end of the tunnel line. The shaft was located at a distance of about ninety feet opposite boring 9 at Station 62. The appellee testified that he decided upon this location for the shaft because the borings drawing on Sheet 3 showed solid limestone throughout the greater length of the boring and into the tunnel level. The appellee immediately met unexpected difficulties because the shaft passed through mud, boulders, clay and water within that area where solid limestone was to be expected. This made the work much more difficult, dangerous and expensive.

The appellee had given a contract for drilling the tunnel to subcontractors who specialized in this kind of work. These subcontractors commenced their operations early in July, 1934. Three weeks later they quit the job, stating that the sub-surface conditions were not as had been represented and that the tunnel they were attempting to drill was not of the kind that they had bid upon. Most of the difficulties

encountered by the appellee in sinking the shaft were met by the subcontractors in their attempts to drill the tunnel. When his subcontractors quit, the appellee hired workmen and endeavored to proceed with the drilling operations himself. Upon August 28, 1934, however, the appellee gave written notice to the appellant that he was terminating the contract. On March 12, 1935 he brought suit in the court below, claiming rescission of the contract because of the fraud of the appellant in misrepresenting the working conditions and because the appellant refused to make a "progress" payment to him for work done. The appellee claimed as damages the fair value and cost of the work, labor and materials furnished by him to the appellant in performance of the contract. The case was tried to a jury which returned a verdict for the appellee in the sum of $61,859.41. Judgment being entered upon this verdict, the City of Reading has appealed to this court.

### Did the Appellee Have the Right to Rescind the Contract for Fraud?

The appellant contends that no fraud was practiced upon the appellee. Directing our attention to Sheet 2, the appellant points out that it appears that the line of the borings does not follow the proposed line of the tunnel, and that it appears from Sheet 3 that the borings contain a number of mud seams, one of which is ten feet high. The appellant also states that every engineer knows that when a boring is sunk through limestone boulders, such a boring will contain limestone. It was not reasonable therefore, the appellant alleges, for the appellee to assume that solid limestone stretched from a point twenty-two feet beneath the earth's surface down the line of the shaft, paralleling boring 9, clear to the tunnel level. The appellee, however, did not abandon the work because of the difficulties encountered by him in sinking the shaft. What is of importance is the fact that the borings drawing on Sheet 3 shows the borings ending in "solid limestone". We think that this is a material and vital fact. The appellant used the phrase to describe the sub-surface conditions which the appellee would encounter. Having used it, the appellant is bound by it.

It appears also that the appellant's engineers made use of the phrase "solid limestone" upon the borings drawing of Sheet 3, despite the fact that the record of diamond drill borings, Exhibit D-1, used the word "limestone" without any qualifying adjective. There is also evidence that the borings in the core boxes had been misnumbered and there was no way in which the boring data shown upon Sheet 3 could be checked by the appellee. It appears also that the appellant's chief engineer, O'Reilly, was aware that the sub-surface conditions were not as represented to the appellee by Sheets 1-6, but that he did not inform the appellee of this fact.

The drawings of a typical section of tunnel lining as shown upon Sheet 4 displayed the conventional engineering sign for rock, viz., straight line hatchings. The appellant points out that the specifications relating to "Support of Excavation" provide for bracing the excavation and state, "In portions of the tunnel which are in solid, unshattered rock supports may be omitted, if the approval of the Engineer is obtained." The specifications also require steel reinforcement where such is necessary, but all of this relates to the lining of the tunnel. The symbol for solid rock shown upon the cross section drawing of Sheet 4 possesses evidentiary value in that this tends to confirm the representation of the existence of "solid limestone" shown by the appellant upon Sheet 3.

The appellee also testified that the "Assumed Rock Line" shown upon Sheet 3 was not as represented and stated that a contractor should be able to " * * * assume that this is the rock line as plotted by the engineer from intelligent investigation." Whether the appellant misrepresented the whereabouts of the rock line was a question for the jury properly left to the consideration of that body by the trial judge.

We must determine whether or not the appellant's misrepresentations as to subsurface conditions could have been discovered by the appellee by the exercise of reasonable diligence upon his part. We are of the opinion that this was a question for the jury, since there was conflict of evidence upon this point. Having this in mind the trial judge propounded Interrogatory 1·to the jury as follows, "Did the defendant in the plans and specifications upon which the plaintiff bid make material misrepresentations as to the character of the subsoil through which the Maiden Creek water supply tunnel was to be constructed, the falsity of which could not reasonably have been discovered upon an inspection of the site of the work?" The jury answered the in-

terrogatory in the affirmative and was justified in doing so.

■ Only one objection might be raised to the interrogatory. It is perhaps too narrow in scope and should not have been limited to facts and conditions which could have been ascertained by the appellee "upon an inspection of the site of the work". The appellant has not raised such an objection, however, and it is a fact that the only other data available to the appellee by inspection were the contents of the core boxes. We are convinced that but little pertinent information could have been obtained by such an inspection which as a matter of fact was made by the appellee's son. Moreover, the general charge of the court as distinguished from the interrogatory, adequately covered the issue.

■ We must conclude therefore that the appellee possessed the right to rescind the contract for fraud and to recover his out-of-pocket expenses for the work done and the materials furnished by him provided he did not act in a manner inconsistent with rescission of the contract. See Hollerbach v. United States, 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898; Christie v. United States, 237 U.S. 234, 35 S.Ct. 565, 59 L.Ed. 933; United States v. Atlantic Dredging Co., 253 U.S. 1, 40 S.Ct. 423, 64 L.Ed. 735; Passaic Valley Sewerage Com'rs v. Holbrook, Cabot & Rollins Corp., 3 Cir., 6 F.2d 721, and Passaic Valley Sewerage Com'rs v. Tierney, 3 Cir., 1 F.2d 304. The decision of the Supreme Court of Pennsylvania in Funk et al. v. School Dist. of Abington Twp., 321 Pa. 435, 184 A. 659, dispels any doubt as to the law of Pennsylvania upon the point at issue.

### Was the Rescission of the Contract by the Appellee Effected in Time and Were His Actions Inconsistent With Such Rescission?

■ It is of course a fundamental principle of the law of contracts that an injured party waives his right to rescind a contract for fraud if he proceeds with the contract after he has learned facts which constitute a basis for rescission. In other words, such conduct is tantamount to affirmation of the contract.

■ We have already stated that the conditions which the appellee met in drilling the shaft were not as represented. The appellee complained to the appellant of the conditions which he was meeting in sinking the shaft upon May 9th, 24th and 26th, and recorded his complaints in the log of the job. Upon July 5th the appellee complained to the appellant's resident engineer that sub-surface conditions were not improving. About the 1st of July the appellee engaged the engineering firm of Sprague and Henwood to make new borings. Upon July 28th, the appellee wrote to O'Reilly, the appellant's chief engineer, and informed him that the subcontractors had abandoned the work, but that the appellee would continue to try to drive the tunnel. On August 6th, the appellee wrote to the appellant concerning the kind of concrete he proposed to use in the work. On August 20th, the appellee again wrote to O'Reilly informing him of discrepancies between the plans and the actual physical conditions which confronted him. These discrepancies were apparent, but O'Reilly disingenuously denied their existence. On August 23rd the appellee wrote again to O'Reilly requesting permission to suspend work on the tunnel for two weeks in order to obtain core tests by borings. Sprague and Henwood made seven borings, beginning their work on July 30th. Three borings were made on the tunnel line. Four borings were made on the line of the old borings. The first hole was bored from July 30th to August 2d. This was at the position of old boring 19. It appears that the appellee's son was present throughout this boring and we may conclude that the appellee was promptly informed as to what all the new boring disclosed. The work of Sprague and Henwood went on from July 30th, 1934 to August 27th, 1934, at which time the new borings were completed. As we have stated, the appellee gave notice of the termination of the contract upon August 28th, 1934.

We cannot conclude from the foregoing that the appellee elected to stand upon the contract and complete the work under it. It is true that certain of the appellee's acts, for example his request made upon August 6th for approval of concrete, were not entirely consistent with rescission. It is also true that by the time he had sunk his shaft he knew that that part of the borings drawing relating to boring 19 was not as represented. The appellee, however, was faced by a difficult situation. He could not lightly abandon the work. He had to have legal justification for doing so. As was well stated by the trial judge, the appellee " * * * was entitled to a reasonable length of time

within which to determine whether the condition he encountered was merely local or whether the misrepresentation was sufficiently substantial and serious to justify his abandonment of the work. He would not have been justified in taking such drastic action unless he had substantial grounds for doing so."

Obviously, the information which induced the appellee to terminate the contract was that which was conveyed to him by the Sprague and Henwood borings. These were completed upon August 27th, and upon August 28th the appellee abandoned the work. In view of this fact we think that the appellant's arguments are entitled to but little weight. Upon the receipt of the new boring data, the appellee had definite evidence of misrepresentation not only along old boring 19 and throughout the very small portions of the tunnel which had been completed, but evidence of general misrepresentation of the sub-surface conditions.

As was stated by Judge Woolley in Passaic Valley Sewerage Com'rs v. Holbrook, Cabot & Rollins Corp., supra, 6 F.2d at page 724, "It is, of course, a general principle of law that a party who desires to rescind a contract must do so within a reasonable time after discovering the ground for rescission. * * * He is not permitted to go on and at the same time retain his right to rescind. But, as the jury found, that was not what happened here. In this case the Commissioners made clear representations as to earth formation on which the contractor had a right to rely and on which it did rely. When it started to work it did not find the conditions as represented. If it had attempted to rescind the contract immediately we doubt that it could have prevailed because a rescission to be valid must be based on a material ground for such action. What was a material ground in work of this magnitude could be determined only by some investigation. The contractor had engaged to drive a tunnel into the earth for a distance of 6,000 feet. What would be disclosed a foot or a hundred feet beyond the shield could be determined only by running the tunnel a foot or a hundred feet. We surmise that the contractor did not have a right to rescind if on the first foot, or perhaps on the first one hundred feet, it had found a formation different from that represented by the contract drawings. The underground conditions which it discovered in its operations had to be substantially and materially different from what had been represented before the contractor's right to rescind would arise. This took work and time."

The facts of the cited case present close analogy to those of the case at bar. We think that no further authority need be cited upon this point.

In Interrogatory 3, the trial judge submitted to the jury the following, " * * did the plaintiff rescind the contract with reasonable promptness after he had ascertained that the misrepresentations as to the character of the sub-soil were substantial and not merely local?" The jury answered this interrogatory in the affirmative and upon the evidence were justified in doing so.

### The Grounds of Rescission Offered by the Appellee in His Letter of August 28, 1934.

In his letter of August 28, 1934 to the City of Reading, terminating the contract, after pointing out that the appellant's chief engineer had refused a progress payment upon the ground that such could be made only on the basis of work completed in accordance with the plans and specifications, the appellee stated, "In addition to the above I am terminating the contract because the information furnished me as a bidder was incorrect and misleading and known to be so to the Engineer in that the assumed rock line on Sheet 3 of 6 of the contract drawings show no drop in same below the line of the tunnel, and the boring data as shown on sheet 3 of 6 is absolutely unreliable and misleading. The core boxes to which bidders were referred for information were incorrectly marked."

Two grounds therefore were set out by the appellee for the termination of the contract. The first, the refusal of the appellant's engineer to authorize the progress payment. The second was the misrepresentation as to sub-surface conditions. We need not pass upon the issue of whether the appellant was justified in refusing the payment to the appellee. The misrepresentations found by the jury to have been made by the appellant to the appellee under the circumstances indicated are sufficient to sustain the verdict.

The recent case of O'Neill Construction Company v. City of Philadelphia, 6

A.2d 525, decided by the Supreme Court of Pennsylvania upon May 25, 1939 is clearly distinguishable upon its facts from the case at bar. In the cited case, the contract between the City and the contractor provided that the records of borings made were for the information of that Bureau of the City concerned and that in no event was such information to be considered a part of the contract. In the case at bar Sheets 1–6 were made a part of the contract and were furnished to the appellee in order that he might make his bid.

Other points raised by the appellant in its defense do not require comment or discussion.

Accordingly, the judgment of the court below is affirmed.