**PARKER PRECISION PRODUCTS CO., a N. J. Corp., Quincy Lucarello**

**v.**

**METROPOLITAN LIFE INSURANCE CO., the United States of America and Leonard W. Leeds (Defendants); Small Business Administration (Defendant on Counterclaim).**

**Nos. 17287, 17288.**

United States Court of Appeals Third Circuit.

Argued Dec. 2, 1968.

Decided Feb. 28, 1969.

Lee A. Holley, Holley & Kroner, Orange, N. J., for appellants.

Eugene M. Haring, McCarter & English, Newark, N. J., argued for appellee, Metropolitan Life Insurance Co.

Thomas F. Campion, Shanley & Fisher, Newark, N. J. (Frederick B. Lacey, Newark, N. J., on the brief), for appellee, Dr. Leonard W. Leeds.

Before HASTIE, Chief Judge, and KALODNER and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

Plaintiffs-appellants challenge a March 11, 1967, order of the District Court which (a) entered judgment for defendant Metropolitan on its counterclaim for rescission of a $20,000. insurance policy on the life of the corporate appellant's deceased President on the ground that such policy was void as procured by fraud,[1] (b) provided for cancellation of such policy upon repayment to the corporate appellant and to the United States of America of the premiums paid ($4,744.80) plus interest, (c) at the end of appellants' case against defendant Leeds dismissed the counts of the complaint against him, and (d) dismissed the balance of the claims of appellants and the United States against defendant Metropolitan.

Parker Precision Products Co. (the company), a New Jersey corporation, applied for an $85,000. loan from the Small Business Administration in 1962. As part of the collateral it was required to assign insurance to be procured on the lives of Parker and Lucarello, its President and Secretary-Treasurer, respectively. The company made application to the Metropolitan Life Insurance Co. for a $20,000. policy on Parker's life. In the medical questionnaire (Part B of the application), Parker answered negatively this question:

> "Have you ever had, or been told that you had, or been treated for, or sought advice concerning: (a) Chest pain, disease of heart, arteries or other blood vessels?"

The following language appeared above his signature:

> "I have read the foregoing answers before signing. They have been correctly written, as given by me, and are true and complete."

Also, Dr. Leeds, Parker's physician, in a separate report to Metropolitan, made no mention of any heart infirmity. According to Dr. Leeds' testimony at trial, however, Parker had visited him in 1957 complaining of chest pains. He diagnosed a posterior myocardial infarction, so informed Parker, and prescribed vasodilating drugs and hospital treatment. The hospitalization was refused.

---

1. This judgment was entered as a matter of law after defendant Metropolitan, by agreement, had first produced evidence before a jury in support of the counterclaim and the plaintiffs had offered evidence in defense thereto.

The policy was duly issued and assigned and the loan consummated. Parker died in 1964. On receiving notice of death, Metropolitan again contacted Dr. Leeds, who revealed the 1957 heart attack. He stated later at trial that he had concealed it in his 1962 report at Parker's request.[2] It thereupon refused to pay and this action for the proceeds ensued, Metropolitan counterclaiming for rescission on grounds of fraud. In an amended complaint, the company added counts against Dr. Leeds based on alleged deceit and misrepresentation, as well as conspiracy with Parker. The United States was made a party defendant by Metropolitan, since it remained the assignee of the policy.

This case is governed by New Jersey law, under which material misrepresentations, even if innocent, will justify rescission of a life insurance policy under the doctrine of equitable fraud. Equitable Life Ass. Soc. v. New Horizons, Inc., 28 N.J. 307, 146 A.2d 466 (1958); Gallagher v. New England Mutual Life Ins. Co., 19 N.J. 14, 114 A.2d 857 (1955); Metropolitan Life Ins. Co. v. Tarnowski, 130 N.J.Eq. 1, 20 A.2d 421 (1941). Furthermore, a misrepresentation is material as a matter of law where knowledge of the truth would naturally influence the judgment of the insurer in making the contract, estimating the risk, or fixing the premium. Gallagher v. New England Mutual Life Ins. Co., *supra*; Urback v. Metropolitan Life Ins. Co., 127 N.J.L. 585, 23 A.2d 568 (1942); Kerpchak v. John Hancock Mut. Life Ins. Co., 97 N.J.L. 196, 117 A. 836 (1922). See Garman v. Metropolitan Life Ins. Co., 175 F.2d 24 (3rd Cir. 1949). Hence, the misrepresentation in Part B of the application, denying heart disease and chest pains, was clearly material.

Appellants urge, however, that they are not bound by the representations of Parker. He independently completed and signed Part B, the medical questionnaire, four days after the company had applied for the insurance and there was no evidence the appellants saw his statements until the policy, with a copy of the completed questionnaire attached, was issued. Nevertheless, we find that provisions in the application form require the rejection of this contention.

The owner application, signed on November 1, 1962, by Lucarello in his capacity as an officer of the company, contained the following language above his signature:

"It is understood and agreed that * * * the statements and answers subscribed to by the Life Proposed in the basic application which was signed by the Life Proposed on the 1st day of Nov., 1962, including the statements and answers referred to in Item 1 of the agreements therein and the statement below when signed by the Life Proposed, shall, together with this application, form the basis of any contract of insurance issued in connection with this application * * *."

Item 1 of the agreements includes this provision:

"It is agreed that: 1. The statements and answers in Part A and B of the application for this insurance shall form the basis of any contract of insurance issued in connection with this application."

In our view, the above provisions bind the appellants to Parker's statements. It was the company who applied for the policy and expected to be benefited by its issuance. By signing the owner application, the company and Lucarello agreed that "the statements and answers in Part * * * B * * * shall form the basis of [the] contract of insurance * * *." Appellants have cited no authority to show that it

---

**2.** Though appellants appear to advance in their briefs an argument based on the falsity of this report, rather than that of 1962, this issue was not framed in the pleadings or in the pre-trial report and no testimony in support of the contention was offered at trial. See Payne v. S. S. Nabob, 302 F.2d 803 (3rd Cir.), cert. den. 371 U.S. 870, 83 S.Ct. 136, 9 L.Ed.2d 107 (1962).

can ignore what the "Life Proposed" stated in Part B because such answers are dated four days after their owner application.[3]

Appellants' major contention is that the jury should have been allowed to decide whether Metropolitan relied upon Parker's statements. An insurer is not entitled to rescind if it relied on other than an insured's representations in issuing the policy. John Hancock Mut. Life Ins. Co. v. Cronin, 139 N.J. Eq. 392, 51 A.2d 2, 169 A.L.R. 355 (1947). Whether it so relied may be a question for the jury. See Ettelson v. Metropolitan Life Ins. Co., 164 F.2d 660 (3rd Cir. 1947) and 137 F.2d 62 (3rd Cir. 1943), cert. den. 320 U.S. 777, 64 S.Ct. 92, 88 L.Ed. 467 (1943); *Garman case, supra.*

At the time of considering the application, Dr. Tenbrinck, an Assistant Medical Director for Metropolitan, had before her Part A (the basic application), Part B (Parker's medical questionnaire), Part C (the report of a standard physical examination conducted by Dr. Mulvaney, a Metropolitan doctor), and reports from Dr. Leeds and Dr. Zins.[4]

As between the various reports, minor discrepancies exist with respect to dates. To a question in Part B, requesting the dates of and reasons for any EKGs or other diagnostic tests taken within the past five years, Parker had answered, "1962—Dr. Leeds—annual chest x-ray, EKG, urinalysis, blood test."[5] Dr. Leeds, queried as to "Laboratory Findings * * * with dates," responded in his 1962 report that he had taken an EKG in 1960. Furthermore, according to this report of Dr. Leeds, Parker's last visit before February 1962 had been in January 1960, whereas Dr. Zins recorded that Parker had been seeing Dr. Leeds every six months. Dr. Tenbrinck acknowledged at trial that she had noticed these inconsistencies but, ascribing them to Parker's forgetfulness, had relied upon Dr. Leed's chronology. This does not prevent Metropolitan from asserting reliance on Parker's material misrepresentations. The court was justified in considering Dr. Tenbrinck's testimony that a medical history recited by an insured from memory is rarely rendered with the accuracy of a physician's records.

Dr. Tenbrinck significantly pointed out, however, that "a patient wouldn't forget" a heart attack. She testified that in this regard she relied on Parker's statements, together with the medical reports before her. Although Metropolitan clearly embarked on an independent investigation by requesting medical reports, reliance on Parker's representations was not thereby precluded.[6]

> "The mere fact that an insurer makes an investigation does not absolve the applicant from speaking the truth nor lessen the right of the insurer to rely upon his statements, unless the investigation discloses facts sufficient

---

3. Nor was there reversible error in the trial judge's ruling that the lack of knowledge by the company and Lucarello of Parker's heart condition in 1957 was irrelevant on the facts presented by this record. See Equitable Life Ass. Soc. v. New Horizons, Inc., *supra.* Fidelity & Casualty Co. v. Howe, 38 F.2d 741 (3rd Cir.), cert. den. 281 U.S. 765, 50 S.Ct. 464, 74 L.Ed. 1173 (1930), and Robson v. Penna. Mutual Livestock Ins. Co., 57 Pa.Super. 491 (1914), cited by appellants, are inapposite, since they deal with whether unsigned applications containing alleged fraudulent statements are admissible in evidence under § 318 of the Pennsylvania Insurance Code, 40 P.S. § 441.

4. Dr. Leeds had been contacted as a result of his identification by Parker in Part B as his physician. Dr. Zins had been requested to retake Parker's blood pressure because Metropolitan considered Dr. Mulvaney's readings elevated.

5. This response is consistent with one set of examinations having been made in 1962, and appellant's apparent contention that it signified that regular annual tests had been made over a period of years prior to 1962 is strained.

6. In fact, Dr. Tenbrinck testified that the original purpose of Dr. Zins' examination was solely to give Parker the benefit of a lower blood pressure reading if that could be obtained.

to expose the falsity of the representations of the applicant or which are of such a nature as to place upon the insurer the duty of further inquiry." John Hancock Mut. Life Ins. Co. v. Cronin, 139 N.J.Eq. at 398, 51 A.2d at 5.

Although the available medical data were insufficient to reveal any falsity in Parker's answers, the various blood pressure readings did present a deviation *inter se*.[7] In determining whether this impressed Metropolitan with a duty of further inquiry, one factor to be considered is what avenues of investigation lay open at the time. Dr. Leeds testified that he made his original diagnosis of posterior myocardial infarction on the basis of EKGs taken in 1957. However, subsequent EKGs which he took in 1959 and 1960 were, in his opinion, inconclusive considered in isolation.[8] The reports before Dr. Tenbrinck in 1962, however, disclosed no EKG taken earlier than 1960, the year given by Dr. Leeds in his 1962 report as the only such test he took. He had also noted that this 1960 EKG showed "no abnormality", a statement which Metropolitan under all the circumstances was entitled to accept without further investigation. Even had it secured and examined the 1960 EKG, the testimony of Dr. Leeds and its own cardiologist indicates that the tracings would not have revealed the prior heart attack.[9]

Had Metropolitan in 1962 any reason to know of the 1957 EKGs, it might have been obligated to make further investigation. But can it be charged with knowledge of, or with a duty to seek, medical data whose very existence and import were within the sole possession of a physician who was willing to represent that he had taken only a 1960 EKG, which was normal? We think not. A liability so broad was expressly rejected in the *Cronin case, supra.*

■ Where, as here, no accessible sources of information are apparent, the question of whether an insurer is nevertheless precluded from relying on an insured's statements is resolved by measuring the extent of the inconsistency, if any, among the various reports.

"It is only when the independent investigation of the company discloses sufficient facts to seriously impair the value of * * * [the insured's statements] that a further duty rests upon the insurer to investigate the statements and admissions in the application." Gallagher v. New England Mutual Life Ins. Co., 19 N.J. at 22, 114 A.2d at 862.

In *Gallagher*, the insurer had received from a medical information clearing house a report of an EKG taken of the insured. It showed a positional deviation of his heart, indicative of a cardiac pathology in 70% of like cases. The application of the insured and the report from the insurer's own medical examiner disclosed no heart disease. The court said that, since the representations in the application and the examiner's report were consistent, it could not conclude the clearing house report seriously impaired their value.

■ Here, Parker's material representations in Part B were not only consistent with Dr. Mulvaney's report, but

---

7. Dr. Mulvaney had twice recorded a diastolic blood pressure of 78. The report of Dr. Leeds offered seven readings over the period 1957–1962 ranging from 70–84. Dr. Zins, however, responded with an average of 109. (Testimony made clear that the diastolic pressure was the important figure in evaluating this application.) Dr. Tenbrinck testified that this last was an "extremely high rating" for Metropolitan, causing the policy to be "rating 3," the next to the highest risk (The application had originally been for

a "standard" policy. Because of his blood pressure, Parker was reclassified as a "rating 3," the next to the highest risk group, and assigned a higher premium.)

8. It is noted that a Metropolitan cardiologist who examined the EKGs in 1966 reached independently the same conclusions.

9. Plaintiffs offered no expert testimony challenging the medical evidence produced by Metropolitan on this point.

with Dr. Leeds' as well. The two doctors had recorded a combined total of nine diastolic blood pressure readings over a five-year period ranging within 70 and 84. Metropolitan in 1962 had no reason to question the accuracy of Dr. Leeds' figures. In effect, this court is asked to hold that Dr. Zins' isolated 1962 blood pressure test, because it departed from a medical pattern which had been regular and unvarying from 1957 up to within one month of his, required the insurer to investigate every other statement of Parker. Under these facts, such a burden would not be imposed on a life insurance company in New Jersey, where the highest court has stated, "It is physically and economically impossible for an insurer to give every potential insured an elaborate medical examination which will disclose the less obvious defects in his health." Equitable Life Ass. Soc. v. New Horizons, Inc., *supra*, 28 N.J. at 312–313, 146 A.2d at 469. We conclude that Metropolitan was justified in relying on Parker's statements, since there was no such impairment of their value as impressed it with a duty to investigate further his physical condition.

■ Furthermore, the District Court correctly held that this record established reliance by Metropolitan on Parker's false answer in Part B as a matter of law. The language of the crucial interrogatory, quoted above at page 2, is straightforward and unequivocal. Implicit in such a question is the fact of reliance upon its answer, unless the insurer can be shown to have disregarded it in favor of medical tests which independently and reliably demonstrated its truth. No such test was available to Metropolitan here. Indeed, it appears the application was approved in spite of, rather than in reliance upon, Dr. Zins' blood pressure readings. Though Dr. Tenbrinck testified she accepted his results, she clearly did so only for the limited purpose of rating the policy.

■ Turning to the claims against Dr. Leeds, the amended complaint enumerates counts of deceit and of conspiracy with Parker to deceive and to interfere with prospective economic relations. The New Jersey Supreme Court has said that the essential elements of a cause of action in deceit are "a false representation, knowledge or belief by the defendant of the falsity, an intention that the plaintiff act thereon, reasonable reliance in acting thereon by plaintiff, and resultant damage." Louis Schlesinger Company v. Wilson, 22 N.J. 576, 585–586, 127 A.2d 13, 18 (1956). See, also, Ocean Cape Hotel Corp. v. Masefield Corp., 63 N.J. Super. 369, 164 A.2d 607 (App.Div.1960); Pappas v. Moss, 257 F.Supp. 345 (D.N.J.1966).

■ The trial judge found that Dr. Leeds made no representation to appellants, that he did not intend them to rely upon his report, that they did not in fact rely upon it, and that they suffered no damage. We agree. There is no evidence that appellants ever knew of the report. Lucarello stated that he neither met nor spoke to Dr. Leeds until after Parker died in 1964. Metropolitan sent its medical questionnaire directly to Dr. Leeds and he returned it upon completion. It was never attached to nor incorporated into the policy. Dr. Leeds testified that he told no one about the report. The only indication that appellants might have even known of Dr. Leeds' existence is Parker's mention of his name in Part B, a copy of which was made part of the policy.

Appellants correctly point out that a false statement need not in all cases be made directly to the plaintiff in order to be actionable. But a misrepresentation, though indirect, must still meet the requirement in New Jersey and most other states that the defendant intend it to be communicated to and relied upon by plaintiff. See Judson v. Peoples Bank & Trust Co., 25 N.J. 17, 134 A.2d 761 (1957); Lembeck v. Gerken, 88 N.J.L. 329, 96 A. 577 (1916); Metric Investment, Inc. v. Patterson, 98 N.J.Super. 130, 236 A.2d 187 (1967); Ultramares Corp. v. Touche, 255 N.Y. 170, 174 N.E. 441, 443, 74 A.L.R. 1139 (1931). Even accepting appellants' contention that Dr. Leeds could foresee that some benefici-

ary would rely upon the insurance, this in our view falls short of the factual basis for liability required in the New Jersey cases.

Appellants' ignorance of Dr. Leeds' report is likewise determinative of reliance. Their brief urges that they reasonably knew there would be a medical investigation and knew or had the right to assume that the medical practitioners would tell what they knew and would not defraud. Nonetheless, they cite no authority that one might rely upon the truthfulness of a representation of whose making he was simply unaware. Such a holding would countenance a claim based on mere speculation as to the existence and contents of a statement.

Dr. Leeds related at trial that Parker, during a visit in 1962, requested him to "belittle the fact that he had heart trouble" in connection with the application for insurance. Any finding that Parker, by thus instigating Dr. Leeds' deceit, caused the company to be benefited as a result, will bear directly on the question whether Dr. Leeds has caused appellants to suffer any damage. Dr. Tenbrinck testified she would have declined the application had Parker's heart attack been disclosed. The company would then have had to procure insurance elsewhere at a substantially higher premium, if indeed any insurer would have undertaken the risk. As it happened, issuance of the Metropolitan policy made possible the loan, which was used to good advantage in consolidating a "pretty bad" debt position and in purchasing new equipment.[10] The company, according to Lucarello, had since "fared very well". By the time of trial in 1966, regular payments had reduced the loan to $43,000. and it had not been called or questioned.

Though the company may have been denied the proceeds of an insurance agreement it perhaps entered in good faith, it desired not insurance but a loan. This it received which might not have been possible but for its President's misrepresentation.[11] Proceeding against Dr. Leeds could enable the appellants to realize further benefits from conduct instigated by the fraud of their own President. New Jersey appellate court decisions do not recognize a cause of action under these circumstances.

■ Appellants' final contention is that the trial judge improperly failed to disqualify himself upon the filing of an affidavit by Lucarello under 28 U.S.C. § 144. The Supreme Court of the United States has said that " * * * the section withdraws from the presiding judge a decision upon the truth of the matters alleged. * * * " Berger v. United States, 255 U.S. 22, 36, 41 S.Ct. 230, 234, 65 L.Ed. 481 (1921). See Simmons v. United States, 302 F.2d 71 (3rd Cir. 1962); Note, 79 Harv.L.R. 1435 (1966). Granting the truth of the allegations, however, they also "must give fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment" before the judge need disqualify himself. Berger v. United States, supra at 33–34, 41 S.Ct. 230, 233. See Simmons v. United States, supra; Note, 79 Harv.L.R., supra. We have carefully examined the affidavit and find it insufficient under the statute, since its allegations do not give "fair support" to the charge of personal bias or prejudice. The allegation upon which appellants appear to lay the greatest emphasis—that a former shareholder in the company had been a witness against a friend of the trial judge—charges no personal bias but, at most, "an imperson-

10. This fact makes unnecessary any discussion of the allegation in the amended complaint that Dr. Leeds is liable for "malicious and wrongful interference with the prospective advantageous economic relations of the Plaintiffs."

11. The counsel for the Small Business Administration who had charge of the loan testified that it could not have been disbursed until the conditions provided for in the authorization were met. One of these conditions was assignment of insurance on the life of Parker.

al prejudice, and go[es] to the judge's background and associations rather than his appraisal of the [plaintiffs] personally." Price v. Johnston, 125 F.2d 806, 811 (9th Cir. 1942), cert. den. 316 U.S. 677, 62 S.Ct. 1106, 86 L.Ed. 1750 (1942).[12]

The March 11, 1967, order and judgments of the District Court will be affirmed.

12. The apparent contention that certain incidents occurring during the trial constituted prejudicial and reversible error, independently of 28 U.S.C. § 144, is rejected after a careful examination of the matters specified in appellants' brief.