**John Basil BIRD et al., Plaintiffs,**

**v.**

**The PENN CENTRAL COMPANY et al., Defendants.**

**Civ. A. No. 71–358.**

United States District Court, E. D. Pennsylvania.

Nov. 16, 1971.

James J. Binns, Philadelphia, Pa., E. Barrett Prettyman, Jr., Stuart Philip Ross, Washington, D. C., Robert G. Schloerb, Chicago, Ill., for plaintiffs.

Henry T. Reath, Philadelphia, Pa., for defendants Ferdinand L. Kattau and William F. Kirk.

David P. Bruton, Lewis H. Van Dusen, Jr., Philadelphia, Pa., for defendant Walter H. Annenberg.

## OPINION

JOSEPH S. LORD, III, District Judge.

Plaintiffs in this action are certain named underwriters trading under the name of Lloyds of London. They seek rescission of an insurance policy providing coverage for defendants which was issued on July 2, 1968, effective as of July 3, 1968. Defendants are the Penn Central Company and numerous individuals, all of whom are present or past directors and/or officers of Penn Central.

On July 2, 1968, defendant David C. Bevan, Chairman of the Finance Committee of the defendant corporation, executed an application [1] for directors and officers liability insurance and company reimbursement insurance. A policy was issued that day, effective the following day, which specifically incorporated this application as a part of the policy.

Item 10 of the application reads:

"No person proposed for this insurance is cognizant of any act, error, or omission which he has reason to suppose might afford valid grounds for any future claim such as would fall within the scope of the proposed insurance except as follows:"

Mr. Bevan's reply on the application to Item 10 was "None Known". Plaintiffs contend that this response was false, and that it was known to be so at the time of the application by Mr. Bevan, as well as other unspecified directors and officers proposed for coverage under the policy. It is claimed that they were aware of at least three situations at the time of application which should have been indicated in response to Item 10: (1) the alleged investment by Penn Central in Executive Jet Aviation; (2) the alleged conflict of interest of certain directors who were involved in a private venture known as Penphil Corporation, and (3) the alleged illegal activities of Howard Butcher, III, a director of the railroad and a senior officer of the stock brokerage firm of Butcher & Sherrerd, which is also alleged to have been involved in such activities.

Plaintiffs allege that the answer given to Item 10 was made in bad faith, was material to the risk, and was justifiably relied on so as to entitle them to rescind the policy because of fraud.

Three of the named defendants, Kattau, Kirk and Annenberg, have now moved for summary judgment under Rule 56, Federal Rules of Civil Procedure, advancing many arguments. Movants' principal argument is that as a

---

1. This application was entitled "Proposal for Directors and Officers Liability and Company Reimbursement Insurance."

matter of law plaintiffs are not entitled to rescission because in their view the policy provides that the sole and exclusive remedy for the failure to advise the insurer of facts in Item 10 is the denial of coverage for any claims subsequently arising from these facts.

■■ In support of this construction of the policy, movants first compare it with other policies of Lloyds, noting that it does not contain any specific language reserving the right to rescind for fraudulent misstatement, unlike, for example, a "Lloyds Accident Policy" form, which is offered as an exhibit. However, as movants recognize, rescission is an equitable remedy available to a defrauded insurer without the necessity of any provision in the policy itself providing for rescission. Fraud renders a contract voidable by the innocent party. E. g., Bremmer v. Protected Home Mutual Life Insurance Co., 436 Pa. 494, 260 A. 2d 785 (1970); Schleifer v. Nationwide Life Insurance Co., 421 Pa. 359, 219 A. 2d 692 (1966); Allstate Insurance Co. v. Stinger, 400 Pa. 533, 163 A.2d 74 (1960). The fact that another type of Lloyds policy expressly provides for rescission is not persuasive that the absence of such a provision expresses an intent to waive the equitable remedy of rescission which is normally available in cases of fraud.

Movants rely heavily on a provision of the application which they assert conclusively proves that plaintiffs intended that any fraudulent response given to Item 10 would not be grounds for cancelling the policy, but rather for a limitation of coverage.

Item 12 of the application reads as follows:

"No fact, circumstance or situation indicating the probability of a claim or action against which indemnification is or would be afforded by the proposed insurance is now known to any Director or Officer of this Company; and it is agreed by all concerned that if there be such knowledge of any such fact, circumstance, or situation, any claim or action subsequently emanating therefrom shall be excluded from coverage under the proposed insurance."

■ What is immediately apparent is that this provision does not mention rescission at all, and in fact contains no language concerning damages or any other remedy whatsoever. There is likewise no reference to fraudulent non-disclosure. It is simply an exclusion from coverage provision for claims arising from any known situations at the time the policy was issued that indicated the probability of a claim. As such it was a vital provision for plaintiffs, in that it excluded from coverage known situations disclosed in reply to Item 10, as well as innocently misrepresented situations either disclosed or non-disclosed. Since Item 12 was directed not only to fraudulent misrepresentation in response to Item 10, it does not become mere surplusage as movants contend, if we construe the policy to permit rescission for fraudulent misrepresentations. Since a fraudulently induced contract is voidable at the option of the innocent party, Item 12 also serves to protect plaintiffs from claims arising from fraudulent misrepresentations if they should decide to affirm such a fraudulently induced policy, rather than seek to avoid it.

■ If we were to accept movants' construction of the policy, Item 10, rather than Item 12, would come close to being mere surplusage. Since Item 12 provided for exclusion from coverage, and this is all that plaintiffs were concerned with in the view of movants, there would be little value in plaintiffs' attempting to apprise themselves of any existing situations before issuing the policy, as they did in Item 10. This is especially true since the insureds would have every incentive to answer Item 10 dishonestly, since there would be no adverse consequences for so doing, while coverage might be gained for Item 10 situations then known by the insureds if the insurer never learned that they were known at the time. We read Item 10 as serving a more important function.

We construe it as being directed at gaining information regarding the nature and scope of the insured risk. Lending force to this interpretation are the questions on either side of Item 10 on the application, Items 9a, 9b, and 11, which are all quite plainly directed at obtaining background information concerning the risk to be involved for plaintiffs, if they were to issue a policy to defendants.[2] We cannot say that plaintiffs would not have acted differently before issuing a policy, if given the knowledge of situations undisclosed by potential insureds in response to Item 10. A large number of known situations that might afford valid grounds for future claims against insureds, or even a few of a particularly serious nature, could possibly cause plaintiffs to reconsider the risk involved, the result being that they would issue a policy only if a higher premium were paid, or that they would refuse to issue any policy at all.

Even if we were to find the language of the policy ambiguous, summary judgment would be improper. Union Insurance Soc. of Canton, Ltd. v. William Gluckin & Co., 353 F.2d 946 (C.A.2, 1965). We hold, though, that the policy is unambiguous. Recognizing that an insurance policy is to be construed most strongly against the insurer who prepared it, Blue Anchor Overall Co. v. Pennsylvania Lumbermens Mutual Insurance Co., 385 Pa. 394, 123 A.2d 413 (1956), we are still unable to find in the policy any indication that plaintiffs intended to waive their equitable right of rescission for fraud. Since we reach this conclusion, it becomes unnecessary to consider whether such a waiver in the policy would be void as against public policy, or if not void, whether it could prevent a tort action for deceit, not based on the contract itself. *See generally* Bankers Trust Co. v. Pacific Employers Insurance Co., 282 F.2d 106 (C.A.9, 1960); Taylor v. Black, 258 F.Supp. 82 (E.D.Mo.1966); Perilstein v. Prudential Ins. Co. of America, 345 Pa. 604, 29 A.2d 487 (1943); Mayer v. Prudential Life Ins. Co. of America, 121 Pa. Super. 475, 184 A. 267 (1936); Corbin on Contracts, § 1516 (1962 ed.).

█ A related argument of movants is that as a matter of law plaintiffs will not be able to establish a claim based on fraud because the allegedly fraudulent response to Item 10 was not material. Movants again contend that the exclusion from coverage provision provided plaintiffs with complete protection, so that, any fraud involved in answering Item 10 would be immaterial. As indicated in our discussion above, this emphasis on possible limitation of coverage is misplaced. If fraudulent statements in the application "influenced the judgment of the insurer in selling the policy and in accepting the risk, then they were material." Karcher v. Security Mutual Life Ins. Co., 186 Pa.Super. 580, 584, 140 A.2d 852, 854 (1958).

█ Movants' assertion in their affidavits that they have made no claims for coverage for any of the matters alleged by plaintiffs as grounds for rescission is of little relevance in determining the materiality of the alleged fraudulent omissions. "The materiality of the statements or answers involved went to the risk assumed, not to the loss incurred." Shafer v. John Hancock Mutual Life Ins. Co., 410 Pa. 394, 400, 189 A.2d 234, 237 (1963). Even if, unlike here,

---

2. Items 9a, 9b, and 11 on the application read as follows:

"9a. No claim which, if insurance had been in force similar to that now proposed, would have fallen within the scope of such insurance has been made or is now pending against any persons proposed for insurance in the capacity of either director or officer of the above Company, except as follows:—(Absence of entry means no exception).

"9b. No similar insurance on behalf of the Company has been declined, cancelled or renewal thereof refused, except as follows:

"11. The Company, its directors and oficers have not been involved in or have any knowledge of any pending anti-trust, price fixing, tax, copyright, or patent litigation, except as follows:—(Absence of entry means no exception)."

no claims at all had been made under the policy, in an otherwise proper case, rescission would be available. The question of materiality is normally one for the jury. *Rigby v. Metropolitan Life Ins. Co.*, 240 Pa. 332, 87 A. 428 (1913). In this case, the issue of materiality should properly be left for determination at trial.

Movants also argue that plaintiffs had to be aware that Mr. Bevan was merely expressing an opinion in answering Item 10 and therefore there could not have been any reliance on his answer, or, in the alternative, that plaintiffs should have realized that Beven could not have known the answer to the question, so that any reliance placed on his statement was unjustifiable. The capability, or apparent capability of Mr. Bevan to answer Item 10 at the time the policy was issued, is a matter which must be more fully developed at trial. We are now informed only of Mr. Bevan's position in the Penn Central organization, but not what duties he normally performed. Summary judgment would be improper at this time on the question of reliance. *See* Associated Hardware Supply Co. v. Big Wheel, 355 F.2d 114, 121 (C.A.3, 1966); Merchants Distilling Corp. v. American Beverage Corp., 33 F. Supp. 304, 306 (D.Del.1940).

■ Movants contend, even assuming, arguendo, that plaintiffs once had grounds for rescission, they have long since waived them. It is well settled that a fraudulently induced contract is not void, but voidable. If the innocent party does not take action to have the contract rescinded within a reasonable time after the discovery of the untruth, but instead conducts himself as if the transaction is still binding, he loses his chance to avoid the contract because he is deemed to have waived any rights he had to rescission. *E. g.*, United States v. Idlewild Pharmacy, Inc., 308 F.Supp. 19 (E.D.Va.1969); Susquehanna Mutual Fire Insurance Co. v. Oberholtzer, 172 Pa. 223, 32 A. 1105 (1895).

Movants point out that the policy was issued on July 3, 1968, while the present action for rescission was not brought until February 16, 1971. They also draw attention to the issuance of subsequent endorsements on the policy by the plaintiffs, the latest being on December 9, 1970. Movants assert that this last endorsement was long after public disclosure of the events pertaining to the Executive Jet Aviation, Penphil, and Butcher & Sherrerd matters, offering copies of various newspaper articles as exhibits.

In rebuttal, plaintiffs attempt to minimize the import of the December 9, 1970, endorsement by stressing that it deals with nothing more than a recognition of the corporate reorganization which had taken place previously. Plaintiffs also assert that their investigation into Penn Central's affairs was concurrent with those of various government agencies, with the complaint in this action being filed just one day after the House Banking and Currency Committee issued its report, "Penphil—The Misuse of Corporate Power."

■ Summary judgment must be denied at this time. Aside from the impropriety of granting the motion on the basis of unsworn exhibits, the issue of whether estoppel has occurred is one which must be examined very carefully. The particular factual situation must be scrutinized to determine whether the innocent party has elected to proceed with the contract after he has learned of the fraudulent representation, or, on the other hand, whether he has merely taken investigatory steps to ascertain whether there is in fact a solid basis for a rescission action, an intentional material misrepresentation. *See* City of Reading v. Rae, 106 F.2d 458 (C.A.3, 1939), cert. denied 308 U.S. 607, 60 S.Ct. 145, 84 L.Ed. 508.

Movants argue that even if estoppel has not taken place and plaintiffs do have a right to rescind generally, they still may not do so as to innocent insureds such as themselves. They offer uncontroverted affidavits in which they claim that they had no knowledge at the time of the issuance of the policy of any matters that might indicate the probability

of a future claim against them. Their truthful answers to Item 10 as individuals, thus, would have been something similar to "None Known," but they were never requested to respond to the application. They further assert that they did not authorize Mr. Bevan or anyone else to make any representations on their behalf on the application. Indeed, defendants Kirk and Kattau allege that they knew nothing at all about an application for insurance, and learned of the policy only through a written memorandum circulated among the staff sometime after July 2, 1968, which informed them that Penn Central Company had purchased "directors' and officers' liability insurance."

█ There is a sufficient basis for finding that the real parties to the contract were plaintiffs and the Penn Central Company. It is undisputed that Penn Central paid the premium, and the policy provides that the Company shall be the one to give and receive notice regarding any claims, as well as paying premiums on behalf of the insureds and receiving any return premiums that may become due. While the policy refers to the Company by name, it nowhere individually names any of the officers or directors. Finally, defendants Kirk and Kattau themselves allege that the Company negotiated the policy, and that they did not learn of it until after it was issued.

Construing the policy in this manner with the Penn Central Company as the contracting party and principal, the innocence of individual directors and officers, such as moving defendants, would be irrelevant. The officers and directors would all be in the position of third party beneficiaries. Their rights as such would depend on the contract, and if it is voidable for fraud as to the contracting party, Penn Central, their rights would rise no higher. *E. g.*, Southern General Insurance Co. v. O'Keefe, 275 F.Supp. 107 (D.Md.1967); Williams v. Paxson Coal Company, 346 Pa. 468, 31 A.2d 69 (1943); Zimnisky v. Zimnisky, 210 Pa. Super. 266, 231 A.2d 904 (1967); Corbin

on Contracts, § 818 (1951 ed.). Movants in attempting to avoid the force of this rule, claim that "intervening equities" should prevent rescission. The only authorities cited for this proposition are mutual insurance cases such as Smith v. Schwartz, 398 Pa. 555, 159 A.2d 220 (1960), where rescission was denied to policyholders who claimed fraud on the part of the directors. This result was reached in order to protect innocent third parties who had bought policies relying on the validity of earlier ones issued, such as those of plaintiffs in that action. The decision in that case and others which refer to intervening equities are based on the unique nature of mutual insurance companies, where each policyholder is both an insurer and an insured. The instant case is readily distinguishable, and presents no basis for varying the usual third party beneficiary rules.

█ Under this view of the policy, if Bevan's authority, or apparent authority to act for Penn Central in obtaining the insurance policy can be proven, his actions would be imputed to the Company, with rescission being granted if all the requisite elements of fraud were present. *E. g.*, Parker Precision Products Co. v. Metropolitan Life Insurance Co., 407 F.2d 1070 (C.A.3, 1969); First National Bank of Weatherly, Pa. v. Aetna Cas. and Sur. Co., 105 F.2d 339 (C.A.3, 1935); Gordon v. Continental Casualty Company, 319 Pa. 555, 181 A. 574 (1939); Erie City Iron Works v. Barber, 106 Pa. 125 (1884). This would be so even if it was demonstrated that defendant Bevan did act fraudulently, but in doing so could only benefit himself, rather than his principal, Penn Central. Brooke v. New York, Lake Erie, and Weston R. R. Co., 108 Pa. 529, 1 A. 206 (1885); 10 Fletcher Encyclopedia Corporations, 4886 (1970); Couch on Insurance 2d, § 25:25 (1960).

█ Another construction of the policy, which would also be plausible, would consider each insured as a contracting party rather than a third party beneficiary. While physically there is only one policy for officers' and directors' liabil-

ity insurance it may be read to amount in fact to several contracts, each of which insured an individual officer or director.

The policy indicates that both the corporation and the directors and officers have the status of insureds. It provides that it may be cancelled "by the Company or the assured." That the policy is geared to the number of officers and directors insured, and their identity, is indicated by the provision that any persons who become officers or directors after the policy is issued will be covered by it subject to written advice and the payment of an additional premium if required.

If we were to accept this construction of the policy, each insured would have to be considered a separate principal for the purposes of agency law. Movants' affidavits are uncontroverted that defendant Bevan had no actual authority to answer questions on an insurance application on their behalf as individuals. There would, nevertheless, still remain the question regarding each principal, of whether he was apparently authorized to act when he completed the application. Restatement, Law of Agency 2d sec. 257 (1958).

This unresolved factual question alone would be enough to deny summary judgment. However, more fundamental is the fact that movants are by this argument attempting to affirm this contract, not avoid it. Movants cannot have it both ways. They may not in the same breath deny that defendant Bevan had any authority to act, and thus attempt to dissociate themselves from any statements he made in obtaining the policy, while at the same time claim to have a binding policy and seek coverage under it. It is a matter of hornbook law that a contract must be affirmed in its entirety in order to effect its ratification. A principal may not claim the benefits of a contract without accepting the consequences of statements made by his agent, or apparent agent, which induced the contract in the first place. E. g., Newland, Admx. v. Lehigh Valley Railroad Company, 315 Pa. 193, 173 A. 822 (1934); Federal Sales Co. of Philadelphia v. Farrell, 264 Pa. 149, 107 A. 668 (1919); Singer Manufacturing Company v. Christian, 211 Pa. 534, 60 A. 1087 (1905); Kalbach v. Marine-Galligan Co., 92 Pa.Super. 185 (1927); Bowman v. Cochran Coal Company, 77 Pa. Super. 118 (1921); Restatement, Law of Agency 2d sec. 96 (1958). Thus, whether the policy is viewed as one contract with Penn Central as the only party besides plaintiffs, or many individual contracts with each insured a party to one of them, defendant Bevan's actions are of paramount importance in determining whether plaintiffs can rescind this policy.

The final argument in support of this motion is based, movants assert, on the "broad and fundamental teaching" of Layman v. Continental Assurance Company, 416 Pa. 155, 205 A.2d 93 (1964), 430 Pa. 134, 242 A.2d 256 (1968). *Layman* held that an insurer could not rescind a life insurance policy because of false statements in the application if a copy of the application had not been furnished to the insured or his beneficiary before the insured's death. The *Layman* case is inapplicable here because its result was based entirely on the construction of a particular statute dealing with life insurance policies. There is no indication that this statutory policy has been extended by the state courts to apply to other situations not covered by statute, so as to constitute "fundamental teaching." Furthermore, the statutory policy in *Layman* was directed towards affording an opportunity to correct unintentionally made errors. This is distinguishable from the situation in this case where plaintiffs allege that the one who completed the application did so fraudulently.

Motion for summary judgment is denied.