**COMMONWEALTH OF PENN-SYLVANIA and Raymond Williams et al.**

**v.**

**LOCAL UNION 542, INTERNATIONAL UNION OF OPERATING ENGINEERS, et al.**

**Civ. A. No. 71-2698.**

United States District Court,
E. D. Pennsylvania.

Dec. 4, 1974.

**156**

Israel Packel, Atty. Gen., Burton Morris, Deputy Atty. Gen., Harrisburg, Pa., Harold I. Goodman, Mark B. Segal, Robert J. Reinstein, Philadelphia, Pa., for plaintiffs.

Abraham E. Freedman, Philadelphia, Pa., John J. McAleese, Jr., Plymouth Meeting, Pa., for defendants.

## OPINION

HIGGINBOTHAM, District Judge.

### INTRODUCTION

Defendants, Local 542, International Union of Operating Engineers, the Contractors Association of Eastern Pennsylvania and the General Building Contractors Association, Inc., have moved this Court pursuant to 28 U.S.C. § 144 (1970) [1] to refrain from further participation in this case. In support of their motions, defendants have filed the affidavits of Robert Walsh, the business manager of Local 542, of Angelo A. Antonucci, the executive secretary of the Contractors Association of Eastern

---

I. The statute provides:

" § 144. *Bias or prejudice of judge*

"Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

"The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accomplained by a certificate of counsel of record stating that it is made in good faith."

Pennsylvania, and of Charlson I. Mehl, the executive director of the General Building Contractors Association, Inc. Each of these affidavits alleges a personal bias on my part in favor of the plaintiff class in the instant action.[2] For reasons that will hereinafter appear, I have concluded that these affidavits are, as a matter of law, insufficient to justify my disqualification as judge in the instant action. Defendants' motions for disqualification must therefore be denied.

## I.

### DEFENDANTS' AFFIDAVITS

In support of their motion for recusal, defendants allege in their affidavits:

1. That the instant case is a class action, brought under the Civil Rights Act of 1964 and other civil rights statutes, charging that defendants have discriminated against the twelve black plaintiffs and the class they represent on the basis of race, and seeking extensive equitable and legal remedies for the alleged discrimination;

2. That I will try the instant case without a jury, and that I am black;

3. That on Friday, October 25, 1974, I addressed a luncheon meeting of the Association for the Study of Afro-American Life and History, during the 59th Annual Meeting of that organization, "a group composed of black historians";[*]

4. That in the course of that speech I criticized two recent Supreme Court decisions which involved alleged racial discrimination, and said, *inter alia,* that:

(a) "I do not see the [Supreme] Court of the 1970's or envision the Court of the 1980's as the major instrument for significant change and

improvement in the quality of race relations in America";

(b) "The message of these recent decisions is that if we are to deal with the concept of integration, we must probably make our major efforts in another forum";

(c) "As I see it, we must make major efforts in other forums without exclusive reliance on the federal legal process."

5. That I used the pronoun "we" several times in the course of the speech, and that my use of this pronoun evidences my "intimate tie with and emotional attachment to the advancement of black civil rights";

6. That by my agreement to deliver the speech I presented myself as "a leader in the future course of the black civil rights movement";

7. That my speech took place in "an extra-judicial and community context," and not in the course of this litigation;

8. That the following day, Saturday, October 26, 1974, *The Philadelphia Inquirer* published "an article appearing under a predominant headline on the first page of the metropolitan news section, . . . describing the October 25th meeting and publishing the aforementioned quotes";[3]

9. That approximately 450,000 copies of *The Philadelphia Inquirer* containing this account were distributed publicly on or about October 26, 1974;

10. That this account made "the community at large" aware of my "significant role as a spokesman, scholar and active supporter of the advancement of the causes of integration";

11. That I believe "that there has been social injustice to blacks in the

---

2. Other aspects of this case have been discussed in an earlier opinion where a preliminary injunction was issued against defendant union because of violence perpetrated by some of its members on some of the black litigants in this case. Commonwealth of Pennsylvania v. Local Union No. 542, International Union of Operating Engineers, 347 F.Supp. 268 (E.D.Pa.1972).

* The text of the address, together with the Program and Souvenir Journal of the 59th Anniversary meeting, are on file in the Office of the Clerk as Appendices "A", "B" and "C," respectively, to the original of this opinion.

3. The newspaper article is set out verbatim at pp. 170–171, *infra.*

United States"; "that these injustices must be corrected and remedied"; and "that they must be remedied by extra-judicial efforts by blacks, including [myself]";

12. That "the very invitation to speak," "the content of [my] remarks" and my "posing for photographs" after the address identify me as "a leader for and among blacks," and "one of the country's leading civil rights proponents";

13. That I am a "celebrity" within the black community;

14. That "I [have] identified, and [do] identify, [myself] with causes of blacks, including the cause of correction of social injustices which [I believe] have been caused to blacks"; that I have made myself "a participant in those causes, including the cause of correction of social injustices which [I believe] have been caused to blacks";

15. That "in view of the applicable federal law," and by reason of my "personal and emotional commitments to civil rights causes of the black community, the black community expectation as to [my] leadership and spokesmanship therein, and the basic tenet of our legal system requiring both actual and apparent impartiality in the federal courts," my "continuation . . . as trier of fact, molder of remedy and arbiter of all issues constitutes judicial impropriety."

These allegations commingle conclusions with facts to an extraordinary degree. Conclusions, of course, are not relevant to this inquiry. United States v. Townsend, 478 F.2d 1072, 1074 (3d Cir. 1973); Inland Freight Lines v. United States, 202 F.2d 169, 171 (10th Cir. 1953). Even if they were, it is difficult to ascertain what defendants mean by certain of the conclusionary allegations they have made. For example, they state that my interest in these matters indicates an "emotional attachment." If, by "emotional attachment," they were implying that I believe that blacks should, in a nonviolent, rational fashion, strive to eliminate racial injustice, I would accept that characterization. If, by the use of the phrase "emotional attachment," they were implying a degree of irrationality, I do not accept that conclusion as a reasonable inference from either my appearance before the Association for the Study of Afro-American Life and History, or the contents of my speech to it, or the newspaper article reporting on the speech.

No matter what defendants assert in their conclusionary allegations, the factual core of their affidavits is the newspaper article in *The Philadelphia Inquirer* of October 26, 1974. The legal sufficiency of the affidavits stands or falls on the basis of what I said and did on the occasion of my October 25th speech, as reported in the *Inquirer* article of the following day, and on any rational inferences that can be drawn from that article.

## II.

## THE LAW OF DISQUALIFICATION

█ It is well settled that the mere filing of an affidavit under § 144 does not automatically disqualify me from hearing the instant case. United States v. Townsend, *supra,* 478 F.2d at 1073; Behr Mine Safety Appliances Co., 233 F.2d 371, 372 (3d Cir.), cert. denied, 352 U.S. 942, 77 S.Ct. 264, 1 L.Ed.2d 237 (1956). Only the filing of a timely and sufficient affidavit will result in such a disqualification. United States v. Townsend, *supra,* 478 F.2d at 1073; Brotherhood of Locomotive Firemen and Engineers v. Bangor and Aroostock R. Co., 127 U.S.App.D.C. 23, 380 F.2d 570, cert. denied, 389 U.S. 327, 88 S.Ct. 437, 19 L.Ed.2d 560 (1967).

█ It is my duty, as the judge against whom a § 144 affidavit has been filed, to pass upon the legal sufficiency of the facts alleged in the affidavit. United States v. Townsend, *supra,* 478 F.2d at 1073; Simmons v. United States, 302 F.2d 71, 75 (3d Cir. 1962). I may not, however, question either the truth of the allegations or the good faith of the pleader. United States v. Town-

send, *supra,* 478 F.2d at 1073; Simmons v. United States, *supra,* 302 F.2d at 75; In re Federal Facilities Realty Trust, 140 F.Supp. 522, 524 (N.D.Ill.1956). "[T]he section withdraws from the presiding judge a decision upon the truth of the matters alleged." Berger v. United States, 255 U.S. 22, 36, 41 S.Ct. 230, 234, 65 L.Ed. 481 (1921); United States v. Townsend, *supra,* 478 F.2d at 1073; see Parker Precision Products Co. v. Metropolitan Life Insurance Co., 407 F. 2d 1070, 1077 (3d Cir. 1969).

 My disqualification will not be warranted unless a § 144 affidavit "give[s] fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment." Berger v. United States, *supra,* 255 U.S. at 33–34, 41 S.Ct. at 233; United States v. Townsend, *supra,* 478 F.2d at 1073–1074. Mere conclusions will not suffice to support such a disqualification. United States v. Townsend, *supra,* at 1074; Inland Freight Lines v. United States, *supra,* 202 F.2d at 171.

"Facts must be pleaded which show that there exists personal bias and prejudice on the part of the trial judge." Inland Freight Lines v. United States, *supra,* at 171; see Simmons v. United States, *supra,* 302 F.2d at 75. Disqualification will be warranted only if such a personal bias is shown. Ex parte American Steel Barrel Co., 230 U.S. 35, 43, 33 S.Ct. 1007, 1010, 57 L.Ed. 1379 (1913); Gallarelli v. United States, 260 F.2d 259, 261 (1st Cir. 1958), cert. denied, 359 U. S. 938, 79 S.Ct. 654, 3 L.Ed.2d 638 (1959); United States v. Hanrahan, 248 F.Supp. 471, 476 (D.D.C.1965).[4] The facts pleaded will not suffice to show the personal bias required by the statute if they go to the background and associations of the judge rather than to his appraisal of a party personally. Parker Precision Products Co. v. Metropolitan Life Insurance Co., 407 F.2d 1070, 1077–78 (3d Cir. 1969); Price v. Johnston, 125 F.2d 806, 811 (9th Cir.),

cert. denied, 316 U.S. 677, 62 S.Ct. 1106, 86 L.Ed. 1750 (1942). "[A judge] must have neighbors, friends and acquaintances, business and social relations, and be a part of his day and generation. * * * the ordinary results of such associations and the impressions they create in the mind of the judge are not the 'personal bias or prejudice' to which the statute refers." United States v. Gilboy, 162 F.Supp. 384, 400 (M.D.Pa.1958), quoting Ex Parte N. K. Fairbank Co., 194 F. 978, 989, 990 (M. D.Ala.1912). Of course, it goes without saying that "[a] judge cannot be disqualified merely because he believes in upholding the law." Baskin v. Brown, 174 F.2d 391, 394 (4th Cir. 1949). If the facts pleaded do not warrant my disqualification, I am not only permitted to continue to preside over the case, I have an affirmative duty not to withdraw. Simmons v. United States, *supra,* 302 F.2d at 75; In re Union Leader, 292 F. 2d 381, 391 (1st Cir.), cert. denied, 368 U.S. 927, 82 S.Ct. 361, 7 L.Ed.2d 190 (1961); Tucker v. Kerner, 186 F.2d 79, 85 (7th Cir. 1950); United States v. Hanrahan, *supra,* 248 F.Supp. at 475; In re Federal Facilities Realty Trust, *supra,* 140 F.Supp. at 524.

### III.

### THE LEGAL SUFFICIENCY OF DEFENDANTS' AFFIDAVITS

 The legal issue raised by defendants' motion is easily disposed of. I have examined the factual allegations of defendants' affidavits in the light of the law, as set forth above, which governs the recusal of a trial judge for reasons of bias or prejudice. That examination leads me inescapably to the conclusion that, as a matter of law, defendants' affidavits are insufficient to justify my disqualification.

Defendants base their motions on my remarks at the 59th Annual Meeting of the Association for the Study of Afro-American Life and History. Those re-

4. In this case, where defendant is the moving party, that bias must work either in favor of plaintiffs or against defendant.

marks in no way manifest the personal prejudice and bias that must be shown in order to satisfy the requirements of § 144. Ex parte American Steel Barrel Co., *supra*; Inland Freight Lines v. United States, *supra;* United States v. Hanrahan, *supra*. They contain no reference to these defendants or to these plaintiffs or to this suit. They relate to my background and my associations, not to any party in this action personally, and are therefore insufficient to show the personal bias required by the statute. Parker Precision Products Co. v. Metropolitan Life Insurance Co., *supra;* Price v. Johnston, *supra*. In the words of Chief Judge Parker, they show "at most, zeal for upholding the rights of Negroes under the Constitution and indignation that attempt should be made to deny them their rights. A judge cannot be disqualified merely because he believes in upholding the law, even though he says so with vehemence." Baskin v. Brown, *supra*, 174 F.2d at 394. The affidavits which recite these remarks are therefore clearly insufficient, as a matter of law, to justify my disqualification.

## IV.

### DEFENDANTS' AUTHORITIES

Because these motions for disqualification touch me personally, I resolved, when they were filed, to give defendants' arguments the fullest possible consideration. Accordingly, I carefully reviewed all of the cases cited by Local 542 in its memorandum in support of the § 144 motion.[5] This research has convinced me that defendant's position, though rich in good faith, is devoid of merit. Each of those cases arose out of a factual context radically different from this one. None of them compels the result that defendant urges me to reach here. Only a handful of them, those in which a judge recused himself voluntarily when he had no legal obligation to do so, even suggest that result.

And, for reasons that I will presently set out, I emphatically do not believe that these cases of voluntary recusal are apt precedents for my decision on these motions to disqualify.

Defendant Local relies primarily on the sweeping language of Justice McKenna in Berger v. United States, *supra*. Its reliance, however, is totally misplaced. In *Berger,* the affidavit filed in support of the motion for disqualification alleged that the presiding judge in an espionage trial, the Honorable Kenesaw Mountain Landis, was prejudiced against the defendants because they were German-Americans. The affidavit further alleged that Judge Landis had said, *inter alia,* that "[i]f anybody has said anything worse about the Germans than I have I would like to know it so I can use it"; that "[o]ne must have a very judicial mind, indeed, not to be prejudiced against the German-Americans in this country. Their hearts are reeking with disloyalty"; and that "[y]ou are of the same mind that practically all the German-Americans are in this country, and you call yourselves German-Americans. Your hearts are reeking with disloyalty." 255 U.S. at 28–29, 41 S.Ct. at 231. Unquestionably, these remarks, made in the context of an espionage trial with German-American defendants, gave "fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment," 255 U.S. at 33–34, 41 S.Ct. at 233, and amply justified the broad language of Justice McKenna's opinion. The instant case is altogether different on its facts. My remarks, as recited in defendants' affidavits, were in no way related to this case. They were addressed to a group of scholars, not to union men generally or to operating engineers in particular. They referred neither to the defendants here nor to the plaintiffs, neither to employment discrimination suits generally nor this cause in particular. They did not promise partiality to blacks in civil rights actions.

---

5. The two other defendant-movants have not filed memoranda of law on this issue. I therefore assume that they have adopted the arguments advanced by Local 542.

If anything, they encouraged blacks to explore forums other than the federal courts for the redress of their grievances. While it is concededly difficult for a man to act as judge in his own case, I do not find that my remarks gave "fair support to the charge of a bent of mind that may prevent or impede partiality of judgment." Consequently, Berger v. United States, *supra*, is, on its facts, clearly distinguishable from the instant case. According to William Shakespeare, "Macduff was from his mother's womb untimely ripp'd." Macbeth, Act V, Scene VIII. Similarly, in an attempt to buttress defendant's memorandum, Mr. Justice McKenna's language in *Berger* was from its context irrelevantly "ripp'd."

The decision of the Court of Appeals for the Third Circuit in United States v. Townsend, *supra*, though liberally cited in defendant Local's memorandum, likewise provides scant support for defendant's position in this matter. In *Townsend*, the affidavit filed in support of the disqualification motion asserted, *inter alia*, that the trial judge in a prosecution for a selective service violation had said at a pretrial conference that "he felt a duty to pressure conscientious objectors into submitting to induction and that a uniform thirty months sentence was the best way to effectuate that policy." 478 F.2d at 1073. This allegation, said the Court of Appeals, was sufficient to show "a bent of mind that may prevent or impede impartiality of judgment." Id. at 1073–74. Again, the facts in this case are wholly different. My remarks were not directed to these plaintiffs or these defendants; they did not concern the issues that are controverted in this case nor did they intimate any view on the merits of this case. Defendant's reliance on United States v. Townsend, *supra*, is therefore manifestly misplaced.

Defendant also quotes extensively from Mr. Justice Frankfurter's opinion in Public Utilities Commission v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1951), where he disqualified himself from participating in the Supreme Court's disposition of that case. In all candor, I must confess that this citation shed very little light on the issue before me. My respect for Mr. Justice Frankfurter is deep and long-standing. Nevertheless, his personal antipathy to the installation of FM radio receivers on public buses has absolutely nothing to do with the legal sufficiency of the facts alleged in defendants' affidavits. Mr. Justice Frankfurter's views on the propriety of disqualification are more accurately revealed by his conduct in United States v. Hutcheson, 312 U.S. 219, 61 S. Ct. 463, 85 L.Ed. 788 (1941). Prior to joining the court, he had co-authored a classical critique of abuses by the federal courts of their equitable jurisdiction in labor disputes. F. Frankfurter and N. Greene, The Labor Injunction (1930). He had also helped to draft the Norris-LaGuardia Act, 47 Stat. 70, 29 U.S.C. § 101 et seq. (1970), which was designed to curb these abuses. Yet in United States v. Hutcheson, *supra*, one of the leading cases interpreting the scope of the Act, he not only did not disqualify himself, he wrote the Court's opinion.

Similarly, as a United States Senator, Mr. Justice Black had been a principal author of the Fair Labor Standards Act, 52 Stat. 1060, 29 U.S.C. § 201 et seq. (1970). He nevertheless heard, and voted with the Court majority in, the case which upheld the constitutionality of the Act, United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941).[6]

The other cases cited by defendant are no more persuasive than *Berger, Townsend* and *Pollak*. In Peacock Records, Inc. v. Checker Records, Inc., 430 F.2d 85 (7th Cir. 1970), the trial judge had

---

**6.** For an extended discussion of these and other instances where Supreme Court Justices have not disqualified themselves from cases where they were arguably prejudiced or biased, see the opinion of Mr. Justice Rehnquist in Laird v. Tatum, 409 U.S. 824, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972).

refused to accept testimony of witnesses to the effect that they had perjured themselves in an earlier trial of the same issues. The Court of Appeals held that the trial judge's prejudgment that the new testimony was perjured, a prejudgment that was not supported by the record of the first trial, showed sufficient prejudice to justify disqualification. That is not this case.

At issue in Morris v. United States, 26 F.2d 444 (8th Cir. 1928), were the timeliness and the good faith of the motion for disqualification. Neither of those issues is disputed here.

In Nations v. United States, 14 F.2d 507 (8th Cir. 1926), the affidavit held sufficient to justify disqualification alleged that the trial judge had stated, prior to trial, that the defendant was guilty of the crime he had been charged with. That is not this case.

In Schmidt v. United States, 115 F.2d 394 (6th Cir. 1940), affiants alleged that the trial judge had assisted the prosecutors in the preparation of their case against the affiants. Clearly, that is not this case either.

In Gladstein v. McLaughlin, 230 F.2d 762 (9th Cir. 1955), the trial judge had initiated, *sua sponte*, a disbarment proceeding against affiant. The latter's affidavit recited statements by the judge which demonstrated prejudice toward the affiant individually and toward a class to which he belonged. Not unnaturally, the Court of Appeals found the affidavit sufficient to disqualify the judge. Once more, however, that case is not this one. In Connelly v. United States District Court, 191 F.2d 692, 695 (9th Cir. 1951), the trial judge had stated his belief that petitioner was a Communist, that Communists hid behind the Constitution, that they "would overthrow that very document and the country that it rests upon," and that "the Communist Party was an illegal conspiracy to overthrow the government of the United States." Though the affidavit reciting these facts sufficed to justify disqualification, the case itself can scarcely be said to control the instant one. In Of-

futt v. United States, 348 U.S. 11, 75 S. Ct. 11, 99 L.Ed. 11 (1954), such great antagonism had developed between the trial judge and defense counsel during a criminal trial that the Supreme Court held it appropriate for another judge to preside over criminal contempt proceedings against the defense attorney. *Offutt* does not control the issue here either.

In addition to Public Utilities Commission v. Pollak, *supra,* defendant has referred this Court to three other cases where judges have voluntarily disqualified themselves. They furnish no support for defendant's position on the legal issue to be determined here. The presiding judge in United States v. Gilboy, 166 F.Supp. 220 (M.D.Pa.1958), recused himself, not because of the legal sufficiency of the facts pleaded in the affidavit urging disqualification, but *sua sponte* in order to expedite affiant's trial for conspiracy. Similarly, in United States v. Quattrone, 149 F.Supp. 240 (D.D.C.1957), the trial judge emphatically stated that he was not required by law to recuse himself, but said that he did so only because, having discussed the case with an individual who was not counsel of record, he might appear to have been influenced by that individual. Finally, in United States v. Valenti, 120 F.Supp. 80 (D.N.J.1954), the presiding judge recused himself *sua sponte* out of an excess of caution, but only after he had carefully considered and rejected the legal sufficiency of the facts pleaded in the affidavit in support of disqualification. In each of these cases, however, the recusing judge understandably felt obliged to offer some explanation for his action. I feel an analogous obligation to explain, not just why I have chosen to remain in this case, but why, in my judgment, it is absolutely essential that I *not* withdraw from this case.

## V.

### BEING BLACK, AND THE APPEARANCE OF IMPARTIALITY

When stripped to its essence, the gravamen of defendants' objection seems

primarily based on the following express or implicit allegations:

(1) I am black;

(2) Some of the defendant union's members are white;[7]

(3) The instant case involves a claim of racial discrimination;

(4) "By agreeing to appear before such group [The Association for the Study of Afro-American Life and History] Judge Higginbotham presented himself as a leader in the future course of the black civil rights movement,"[8] and

(5) By my appearance at the Association's meeting and/or by the substance of the remarks I actually made or as they were quoted in the newspaper, "the continuation of [Judge Higginbotham]

as finder of fact, molder of remedy, and arbiter of all issues constitutes judicial impropriety."[9]

## A. *Being Black*

I concede that I am black. I do not apologize for that obvious fact. I take rational pride in my heritage, just as most other ethnics take pride in theirs. However, that one is black does not mean, *ipso facto*, that he is anti-white; no more than being Jewish implies being anti-Catholic, or being Catholic implies being anti-Protestant. As do most blacks, I believe that the corridors of history in this country have been lined with countless instances of racial injustice.[10] This is evident by the plain historical fact that for more than two

---

7. Defendant union now casts their case in racial tones and seems to imply that it is a challenge between blacks on one side, as plaintiffs, and whites on the other, as defendants. Yet, at an earlier date, when this matter was before me on a motion for preliminary injunction, counsel for defendants, Abraham E. Freedman, Esquire, constantly argued that what was involved here was a dispute between some blacks on the plaintiff's side and some blacks and whites on the union side. He emphasized that Mr. Eaddy, a plaintiff who was black, attacked Mr. Holland, who was black, and Holland was a union official. See transcript of June 29, 1972, p. 312, and 347 F.Supp. 268, 273–274, 278. At that time, Mr. Freedman emphasized time and time again that there were many members of defendant's union who were black and thus there are certain inherent contradictions between the racial categorization as to defendant's union which Mr. Freedman, their counsel, now makes as compared to those which he previously asserted on June 29, 1972, when he argued:

"I would say to Your Honor this, too, the twelve plaintiffs here, Your Honor, are all out from Benjamin Franklin No. 1—I think it is No. 1—and I think a couple from No. 2. *The union has about three hundred black men in this union,* men who work very regularly, men who make as much or more than most white men, men who are called to jobs without having to go through the union hall because they are called by the employers. Most of the blacks, Your Honor, most of the blacks are called by the employers and put on a regular basis where they are called without having to go through the union hall." (N. T., pp. 312–13) (emphasis added)

I had never perceived this case as one which was an exclusively black versus an exclusively white confrontation, particularly because of the arguments which Mr. Freedman had previously made at great length when the union was resisting the motion for preliminary injunction. However, if defendants desire to cast their case in the posture of blacks as plaintiffs versus whites as defendants (thus disregarding its purported interracial membership and thereby assuming that the 300 black members in the union have no stake in this matter), for the purpose of the instant motion I will accept the categorizations which defendants imply in their petitions.

I have no knowledge of the racial composition of the Contractor's Association.

8. Union affidavit, ¶ 2(e).

9. Union affidavit, ¶ 2(m).

10. For general background, see R. Bardolph, *The Civil Rights Record* (1970); J. Blassingame, *Black New Orleans* (1973); J. Blassingame, *The Slave Community* (1972); S. Elkins, *Slavery* (1959); J. H. Franklin, *From Slavery to Freedom* (4th ed. 1974); G. Fredrickson, *The Black Image in the White Mind* (1971); L. Green, *The Negro in Colonial New England* (1942); W. Jordan, *White Over Black* (1968); G. Myrdal, *An American Dilemma* (1944); B. Quarles, *The Negro in the Making of America* (rev. ed. 1969); K. Stampp, *The Peculiar Institution* (1956); C. Woodson & C. Wesley, *The Negro in Our History* (11th ed. 1966); C. V. Woodward, *Origins of the New South* (1951); C. V. Woodward, *The Strange Career of Jim Crow* (2d rev. ed. 1966). For the best bibliography, see A. Hornsby, *The*

and a half centuries, millions of blacks were slaves under the rule and sanction of law—a fate which confronted no oth-er major minority in this country.[11] Every presidential commission [12] and almost every Supreme Court opinion [13]

*Black Almanac* 169 (1972). For an anthology, see *Civil Rights and the American Negro* (A. Blaustein & R. Zangrando eds. 1968).

11. See the pioneer works of D. Bell, *Race, Racism and American Law* (1974) and M. F. Berry, *Black Resistance/White Law* (1971); T. Emerson, D. Haber, N. Dorsen, *Political and Civil Rights in the United States* (3rd ed. 1967) and 1973 Supplement, Chapters 13–21; 2 L. Pollak, *The Constitution and the Supreme Court* 201–389 (Meridian ed. 1968). See also H. Abraham, *Freedom and the Court*, Ch. VII (2d ed. 1972); Higginbotham, "Racism and the Early American Legal Process, 1619–1896," 407 Annals 1 (1973), and Book Review, "Race, Racism and American Law," 122 U.Pa.L.Rev. 1044–69 (1974); cf. B. I. Bittker, *The Case for Black Reparations* 13–17 (1973).

12. The first commission on civil rights appointed by any president was created by President Harry Truman, Executive Order 9808. In 1947, the President's Committee on Civil Rights filed a report, "To Secure These Rights," which stated:

"Our American heritage of freedom and equality has given us prestige among the nations of the world and a strong feeling of national pride at home. There is much reason for that pride. But pride is no substitute for steady and honest performance, and *the record shows that at varying times in American history the gulf between ideals and practice has been wide.* We have had human slavery. We have had religious persecution. We have had mob rule. *We still have their ideological remnants in the unwarrantable 'pride and prejudice' of some of our people and practices.* From our work as a Committee, we have learned much that has shocked us, and much that has made us feel ashamed. But we have seen nothing to shake our conviction that the civil rights of the American people—all of them —can be strengthened quickly and effectively by the normal processes of democratic, constitutional government. That strengthening, we believe, will make our daily life more and more consonant with the spirit of the American heritage of freedom. *But it will require as much courage, as much imagination, as much perseverance as anything which we have ever done together.* The members of this Committee reaffirm their faith in the American heritage and in its promise." Id. at 9–10 (emphasis added). Sadie T. M. Alexander, famed Philadelphia lawyer and wife of the late Judge Raymond Pace Alexander, was a member of this first Presidential Commission. See also *Report of the National Advisory Commission on Civil Disorders* (Washington, D.C.: U.S. Government Printing Office, 1968); National Commission on the Causes and Prevention of Violence, Final Report, "To Establish Justice, To Ensure Domestic Tranquillity" xxi, 8, 10, 13–15 (1969); 1 National Commission on the Causes and Prevention of Violence, Staff Report, "Violence in America: Historical and Comparative Perspectives" 38–41 (1968). Cf. Milton S. Eisenhower, *The President is Calling* 2–4 and Ch. 23 (1974).

13. See n. 11, *supra,* and the facts involved in the following cases: Prigg v. Pennsylvania, 41 U.S. (16 Pet.) 539, 10 L.Ed. 1060 (1842); Dred Scott v. Sandford, 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1857); Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L. Ed. 835 (1883); Plessy v. Ferguson, 163 U. S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896); Berea College v. Kentucky, 211 U.S. 45, 29 S.Ct. 33, 53 L.Ed. 81 (1908); Hodges v. United States, 203 U.S. 1, 27 S.Ct. 6, 51 L. Ed. 65 (1906); James v. Bowman, 190 U.S. 127, 23 S.Ct. 678, 47 L.Ed. 979 (1903); Baldwin v. Franks, 120 U.S. 678, 7 S.Ct. 656, 32 L.Ed. 766 (1887); United States v. Harris, 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290 (1883); United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588 (1876); United States v. Reese, 92 U.S. 214, 23 L.Ed. 563 (1876); United States v. Powell, 151 F. 648 (C.C.N.D.Ala.1907), aff'd per curiam, 212 U.S. 564, 29 S.Ct. 690, 53 L.Ed. 653 (1909). The following cases indicate the past problem of racial injustice and efforts to eliminate it:

(1) *Voting.* South Carolina v. Katzenbach, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966) (implementation of 1965 voting rights act); Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); Grovey v. Townsend, 295 U.S. 45, 55 S.Ct. 622, 79 L.Ed. 1292 (1935); Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927); Anderson v. Martin, 375 U.S. 399, 84 S.Ct. 454, 11 L.Ed.2d 430 (1964); Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932); cf. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963) (one man-one vote); Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). See also Burke Marshall, Federalism and Civil Rights (1964).

(2) *Education.* Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S. Ct. 1267, 28 L.Ed.2d 554 (1971); Brown v.

dealing with racial matters have noted the fact that in this country, there has often been racial injustice for blacks.

 Thus a threshold question which might be inferred from defendants' petition is: Since blacks (like most other thoughtful Americans) are aware of the "sordid chapter in American history"[14] of racial injustice, shouldn't black judges be disqualified *per se* from adjudicating cases involving claims of racial discrimination? Defendants do not go so far as to precisely assert that black judges should *per se* be disqualified from hearing cases which involve racial issues, but, as will be demonstrated hereinafter, the absolute consequence and thrust of their rationale would amount to, in practice, a *double standard* within the federal judiciary. By that standard, white judges will be permitted to keep the latitude they have enjoyed for centuries in discussing matters of intellectual substance, even issues

of human rights and, because they are white, still be permitted to later decide specific factual situations involving the principles of human rights which they have discussed previously in a generalized fashion. But for black judges, defendants insist on a far more rigid standard, which would preclude black judges from ever discussing race relations even in the generalized fashion that other justices and judges have discussed issues of human rights. Under defendants' standards, if a black judge discusses race relations, he should thereafter be precluded from adjudicating matters, involving specific claims of racial discrimination.

To suggest that black judges should be so disqualified would be analogous to suggesting that the slave masters were right when, during tragic hours for this nation, they argued that only they, but not the slaves, could evaluate the harshness or justness of the system.[15] If de-

---

Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); McLaurin v. Oklahoma State Regents, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149 (1950); Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950); Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 (1958); Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Gong Lum v. Rice, 275 U.S. 78, 48 S.Ct. 91, 72 L.Ed. 172 (1927); Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208 (1938); Cumming v. County Board of Education, 175 U.S. 528, 20 S.Ct. 197, 44 L.Ed. 262 (1899).

(3) *Housing.* Tillman v. Wheaton-Haven Recreation Ass'n, 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973); Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917); Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940); Corrigan v. Buckley, 271 U.S. 323, 46 S.Ct. 521, 70 L.Ed. 969 (1926); Richmond v. Deans, 281 U.S. 704, 50 S.Ct. 407, 74 L.Ed. 1128 (1930); Harmon v. Tyler, 273 U.S. 668, 47 S.Ct. 471, 71 L.Ed. 831 (1927); Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953).

(4) *Employment.* Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Steele v. Louisville & N. R. R.,

323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944).

(5) *Public Accommodations.* Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L. Ed.2d 290 (1964); Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

(6) *Prohibition of racial violence.* Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); United States v. Johnson, 390 U.S. 563, 88 S.Ct. 1231, 20 L.Ed.2d 132 (1968); Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

14. William H. Hastie, "Toward an Equalitarian Legal Order, 1930–1950," 407 Annals 18, 19 (1973).

15. As an example, Judge Ruffin, author of the infamous opinion in State v. Mann, 13 N.C. 263 (1829), speaking in 1855 before the State Agricultural Society of North Carolina, said:

"I very frankly avow the opinion, that our mixed labor of free white men of European origin, and of slaves of the African race, is as well adapted to the public and private ends of our agriculture as any other could be—making our cultivation not less thorough, cheap and productive than it would be, if carried on by the whites alone, and far more so than the blacks by themselves would make it; and, therefore, that it has a beneficial influence on the prosperity of the

fendants are not implying this extreme position about blackness *per se* as a basis for disqualification, then one must examine the rationale of their other allegations.

B. *The Perniciousness of Appearing Before The Association for the Study of Afro-American Life and History?*

The newspaper clipping and the pleadings state that I was speaking to "a group of black historians"[16] at the 59th Annual Meeting of the Association for the Study of Afro-American Life and History.[17] This organization was not a labor group, not an institute of management, not a political party, not the Black Panthers, not any entity which on or off the record has ever had a history antagonistic to those white Americans who believe in equal justice under the law. When compared with the meetings or conventions of labor unions, management associations, political parties or partisan activist groups, a meeting of historians is almost by definition as calm and dispassionate a gathering as one can find on the national convention scene. More often than not, historians suggest tentative hypotheses about social issues by analyzing the ebb and flow of the tides of history. Generally, they do not volunteer precise answers to those specific fact-finding aspects of the litigation process which are partially dependent on issues of the credibility of proffered evidence. In his classic Nora and Edward Ryerson Lecture at the University of Chicago, on April 23, 1974, famed scholar John Hope Franklin,[18] speaking on "The Historian and Public Policy," suggested:

> *"One might argue that the historian is the conscience of his nation, if hones-*

country, and the physical and moral state of both races, rendering both better and happier than either would be here, without the other.

\* \* \* \* \*

*"We know that our slaves are generally humble, obedient, quiet and a contented and cheerful race of laborers.* Scattered over the plantations in rural occupations, they are never riotous or dangerous, as the same number of uneducated working men have often been in other parts of our country. Slaves are no part of this State, with no political power, and seek no violent or sudden change in the law or policy of the country; and where slavery exists labor and capital never come in conflict, because they are in the same hands, and operate in harmony. It is not, then, a blot upon our laws, nor a stain on our morals, nor a blight upon our land." (emphasis added) 8 Publications of the North Carolina Historical Commission (Part 4), 4 The Papers of Thomas Ruffin 329–337; see A. L. Higginbotham, Race and the American Legal Process, unpublished monograph, Ch. II.

16. Defendants rely on the newspaper article which said that I spoke to "a group of black historians." Actually, it was an interracial group of historians, but most of them were black.

17. The souvenir journal and the program of this 59th Annual Meeting are attached as appendices B and C. The inside front cover of the souvenir journal notes:

"The Association for the Study of Afro-American Life and History was conceived by Dr. Carter G. Woodson as an instrument to promote appreciation of the life and history of the Black American, to encourage an understanding of present status, and to enrich the promise of the future.

In 1915, there was, as now, tremendous neglect of the study of the Negro and most other racial groups. Out of this lack of understanding, misinformation about race and color flourished. The founding of The Association for the Study of Afro-American Life and History provided needed reconstruction of thought based on historical truth about African heritage of black people, ancient history and worthwhile contributions to the founding and the continuation of the United States of America.

JOIN NOW

The Association for the Study of Afro-American Life and History, a major national organization in the twin fields of life and history, *is composed of members of all racial groups in America.* We welcome your membership, and offer full participation in meetings, conferences and conventions and in other activities." (emphasis added)

The primary publication of the Association of Afro-American Life and History is the *Journal of Negro History.*

18. Professor John Hope Franklin is the Vice President of the Association for the Study of Afro-American Life and History, former Chairman of the History Department of the

ty and consistency are factors that nurture the conscience. Perhaps that is too much to claim for the historian who, after all, is not in the business of protecting the morals of a people.

It would be enough if in our time the historian were to look at our many public policies that we claim to be firmly based in the hallowed past and see if that is in fact the case. As we approach the bicentennial of our national independence and as we pursue many of our public policies in the name of the founding fathers—our black policy, our red policy, our foreign policy, or whatever—the historian and, indeed, all of us should take a hard look at what we ascribe to the founding fathers. But in this antepenultimate year of our bicentennial, the time is at hand for us to recognize the fact that deep veneration is one thing and uncritical approbation is quite another. If we cannot celebrate their achievements and, at the same time, recognize their human frailties which led them to make numerous mistakes, we are unworthy of the legacy we claim to celebrate.

The people, yes, the people, shall judge; but they require a sound basis for making judgments. They will have that basis if and when they know what has happened, why it has happened and, consequently, how the public policies growing out of historical events or shaping those events can serve the common good. If, then, the people prefer to ignore their past mistakes and prefer to live in a world of fantasy and make-believe, they will deserve to suffer the *fate of repeating the grave errors that they could easily have avoided."* (emphasis added)[19]

If historians meet as the "conscience of a nation" so that we will not ". . . suffer the fate of repeating the grave errors that [we] could easily have avoided," what is it that is so deplorable about appearing before a group of "black historians,[20] whose purpose it is to analyze the strengths and the frailties of our society? Why is it so intrinsically wrong to speak to these historians on the subject "Racism and the American Legal Process: Where Have We Been and Where Are We Going?"

Would it have been permissible for a black to have talked to white historians, or is there something particularly opprobrious about speaking to any group of historians which thereafter taints one's ability to participate in the judicial process? Do petitioners suggest that it is more sinister for a black judge to speak to black historians than for the Chief Justice of the United States Supreme Court to speak to the National Conference of Christians and Jews?[20a] Should the distinguished Chief Justice be barred in the future from adjudicating cases where claims of religious or racial bigotry are urged, simply because he spoke to a distinguished group which supports the concepts of the brotherhood of man, the golden rule, and fair play?

Many judges of this court have spoken to bar associations, including those specialized sections of the bar such as the plaintiff's personal injury bar, or the defense bar. Should such judges be forever barred from adjudicating personal injury cases involving plaintiffs or defendants? Is there anything more ma-

University of Chicago, and presently John Matthews Manly Distinguished Service Professor, University of Chicago. On Friday, October 25, 1974, he gave the major morning lecture, "George Washington Williams and the Beginnings of Afro-American Historiography." Other major books by John Hope Franklin related to the race relations issues are: *The Free Negro in North Carolina, 1790–1860* (1969); *From Slavery to Freedom: A History of Negro Americans,* (4th ed. 1974); *The Militant South, 1800–*

*1860* (1964); *Reconstruction After the Civil War* (1973); *The Emancipation Proclamation* (1965); *Land of the Free* (1970); *Illustrated History of Black Americans* (1973).

19. p. 17.

20. See n. 16, *supra.*

20a. See the address of Mr. Chief Justice Burger at the 1972 Annual Dinner of the National Conference of Christians and Jews, November 16, 1972.

levolent in speaking to a group of black historians about equal justice under the law than for a Catholic, Jewish, or Protestant judge to speak in his cathedral, synagogue or church on the Sermon on the Mount, or the Torah? If a Catholic judge spoke to a group of Catholic historians, should he be forever barred from adjudicating cases involving the constitutionality of state appropriations disbursed to parochial schools? Was my speech malevolent because its occasion was a national meeting? Does something inherently more pernicious occur when 100 black historians get together at a national conference than when 20 meet in a local setting?

### C. *Is it Permissible for Black Judges to be Scholars in the Race Relations Field?*

█ Again and again in their petition and memorandum of law, defendants charge that by my appearance before the Association for the Study of Afro-American Life and History "the community at large was, as a consequence, made aware of Judge Higginbotham's significant role as a spokesman, scholar and active supporter of the advancement of the causes of integration." [21] Do defendants think it sinister that some individuals consider me a scholar in the race relations field? Is it that scholarship which is their ultimate grievance? [22] We have noted previously that, while at Harvard, Mr. Justice Frankfurter wrote the classic critique of abuses by the federal courts of their equitable jurisdiction in labor disputes. F. Frankfurter and N. Greene, The Labor Injunction (1930). He also helped to draft the Norris-LaGuardia Act, 47 Stat. 70, 29 U.S.C. § 101, et seq., which was designed to curb these abuses. Yet no one asserted that his prior scholarship precluded him from sitting as a Justice in United States v. Hutcheson,

*supra,* one of the leading cases interpreting the scope of the Norris-LaGuardia Act. He not only did not disqualify himself, he wrote the Court's opinion. If Justice Frankfurter, after years of scholarship at Harvard, had not lost the capacity to construe impartially a statute which he drafted, why should a black judge be disqualified because he has studied the legal history of racism and taught the subject at some of the leading universities of this nation?

In this Circuit, former Chief Judge Biggs for decades displayed a keen interest and wrote decisively in the forensic psychiatry field. Probably more than any federal judge in the nation he was responsible for analyzing the deficiencies of the legal process when it dealt with issues of mental illness. In 1954, he received the Isaac Ray Award of the American Psychiatric Association, which is granted annually to the " . . . individual deemed fit and deserving of such honor in the field of the relationship between psychiatry and jurisprudence." In 1955, he published his classic book, *The Guilty Mind.* It was reviewed in *The Legal Intelligencer* of April 4, 1956 as follows:

"The Dr. Ray Award Committee chose even better than it knew. *The Guilty Mind* revealed something more than an able jurist's insight in an allied field. It embodied a lifelong study, extensive experience, and a profound sympathy. Here, in review, passes a pageant of history—the primitive codes of savage tribes, the practices of ancient civilizations, the superstition of the middle ages, the brutality of yesterday and today. The story of the law and the mentally ill is told movingly, with sympathy and scholarship; a shocking and sobering story even for those who are familiar with the outline and many of the facts."

21. See ¶ 9, p. 3 of the motion and ¶ 2(j), p. 3 of defendant union's affidavit.

22. The terms "spokesman" and "active supporter" are conclusionary, and to the extent that they are permissible inferences, I have dealt with that aspect at p. 158.

Should, after 1954, Judge Biggs have been disqualified from hearing cases involving mental illness because the American Psychiatric Association recognized his tremendous scholarly talents and gave him their most coveted award?

Complex patent cases in this district were constantly assigned to the late Judge William H. Kirkpatrick. Should he have been disqualified because of his nationally recognized expertise in patent law? Are defendants suggesting that, except for black judges who become scholars on race and the American legal process, all other judges may be scholars in *any* field in which they may later be required to make an adjudication?

Defendants' objection to scholarship again displays their insistence on a different standard for black judges. Presumably defendants should not fear scholarship, but should instead be pleased that they would not have to "educate" a judge on the rudiments of the field.

## VI.

### THE SUBSTANCE OF THE SPEECH AND RELEVANT PRECEDENT

If defendants' claim cannot rest on disqualification *per se* because I am black, if it cannot rest on the fact that a black judge spoke to a conference of black historians, if it cannot rest on the fact that some think I have a reputation for scholarship in matters dealing with race and the legal process, then the viability of the motions must depend on the content of the speech, either as actually given or as reported in the newspaper

clipping which was attached as an exhibit to their motions.

Because defendants' motions contained some outlandish constructions of the content of the newspaper article and hypothesized other circumstances which purportedly attended my speech, I am attaching as appendices:[23]

(1) the speech as actually prepared for the conference, copies of which were made available to the press at their request.

(2) The official program of the 59th Annual Meeting of the Association for the Study of Afro-American Life and History, and

(3) the souvenir journal of the convention.

There is an extraordinary gap between the facts as reported in the newspaper article and the inferences, speculation and hunches which defendants assert in their motions for disqualification. Defendants apparently are relying on the newspaper clipping as their basis for disqualification, yet in their brief they make assertions which exemplify more fantasy than logic. As an example, they assert that "During his speech Judge Higginbotham spoke in emotional terms of solidarity, . . ."[24]; yet not once is the word "solidarity" used or implied[25] in the newspaper clipping, nor was it used in the speech. What is the basis for their inference that I spoke of solidarity in emotional terms? The article notes:

"Judge Higginbotham told the delgates, who interrupted his speech with applause, that his scepticism (of the Supreme Court) had been expressed by Supreme Court Justices. He iden-

23. I recognize that the basis of disqualification must be the newspaper article and what it asserts that I said; however, I am voluntarily including these appendices so that there can be no question about what was in fact said and the nature of the organization to which I spoke. The appendix copy of the speech is identical in every respect to that which was made available to the press, except for typographical corrections. The substance of the speech I gave was the same as

that of the written text in Appendix 1; though some portions of the speech were summarized because of time limitations, much of it was read word for word as it appears in the appendix.

24. *Defendant union's brief, p. 2.*

25. Defendants apparently assume that the term "we" is a synonym for "solidarity." See my discussion of this assumption, *infra.*

tified Justice Thurgood Marshall as one of them."

Thus, the core for all of defendants' inferences is the word "applause." But applause does not necessarily mean that a presentation was made in "emotional terms." To imply that it was made in "emotional terms" is predicated on the assumption that several hundred black scholars cannot react with enthusiasm to a rational and non-emotional address. To say that the speaker spoke in terms of "solidarity" must be predicated on a similar assumption, that black scholars cannot react with enthusiasm to a rational presentation until the declarant uses the term "solidarity."

Defendants assert that my use of the term "we" indicates an emotional identification with my audience which requires my disqualification. Perhaps defendants would have wanted me to say "*You* black people must pursue *your* options for equal justice in other forums." Maybe that approach would have been permissible. Perhaps, on the Fourth of July, they would want orators to say "*You* hold these truths to be self evident, that all men are created equal . . . ," but never declare that "*We* hold these truths to be self evident." If defendants' rationale is accepted, whenever an orator says "we" in such a context, he is involved in a conspiracy which precludes his capacity to judge thereafter with impartiality.

Finally, defendants assert that "By agreeing to appear before such group, Judge Higginbotham presented himself as a leader in the future course of the black civil rights movement."[26] The defendants overstate their case and probably unintentionally denigrate the black civil rights movement. They confuse the civil rights movement with the study of history.

Yet even if the inferences asserted are permissible, the crux of their objection has to be that I dared to speak out on Racism and the American Legal Process to a group of black historians, and that the substance of my comments indicates a bias that will affect this case. The entire article read as follows:

## BLACKS TOLD NOT TO RELY ON SUPREME COURT ALONE

By Acel Moore
Inquirer Staff Writer

U. S. District Court Judge A. Leon Higginbotham, Jr. told a group of black historians Friday that blacks can no longer rely "exclusively" on the Supreme Court as the major instrument for social justice.

"I do not see the court of the 1970's or envision the court of the 1980's as the major instrument for significant change and improvement in the quality of race relations in America," Judge Higginbotham said.

Higginbotham leveled criticism at the Nixon Supreme Court near the end of his luncheon speech before delegates attending the 59th annual meeting of the Association for the Study of Afro-American Life and History (ASALH) at the Benjamin Franklin Hotel.

In his criticism Higginbotham cited two recent Supreme Court decisions: the Detroit school-busing case, in which the court overturned a plan that would have provided busing between districts to achieve integration, and a public accommodation case involving the Moose Lodge in Harrisburg.

In the Moose Lodge case, the court ruled that the Fourteenth Amendment could not deal with discrimination in a place of public accommodation.

"The message of these recent decisions is that if we are to deal with the concept of integration, we must probably make our major efforts in another forum," Higginbotham told the gathering.

Judge Higginbotham told the delegates, who interrupted his speech with applause, that his "skepticism (of the

---

26. Defendant union's affidavit at 2, ¶ 2(e).

Supreme Court) had also been expressed by Supreme Court justices." He identified Justice Thurgood Marshall as one of them.

"As I see it, we must make major efforts in other forums without exclusive reliance on the federal legal process," said Higginbotham.

Higginbotham praised the high court under the late Chief Justice Earl Warren for its decisions on integration.

From this article the only rational inferences which can be drawn, if one assumes that the reporter's comments were accurate, are that the historians were told:

(1) that they should not rely on the Supreme Court alone;

(2) that I am critical of the current Supreme Court for its decisions in two recent cases, and

(3) that this criticism had been expressed by justices of the United States Supreme Court, including Justice Thurgood Marshall.

Even if the reporter was accurate in his conclusionary summaries, the article does not imply in any respect that I would not follow any mandate of the Supreme Court, or any applicable federal law; for of course I will. Taking the article in the light most favorable to defendants, I merely repeated what Judge William Hastie has said about an earlier period of the court's history.[27]

## VII.

## THE PRECEDENTS OF HASTIE, STEWART, ALEXANDER AND BURGER

One of the most profound statements ever made on race and the American legal process was Judge William H. Hastie's authoritative article, "Toward an Equalitarian Legal Order, 1930–1950," in *The Annals of the American Academy of Political and Social Science*, May 1973. Judge Hastie began his article as follows:

"During the decade immediately after the American Civil War, the newly enacted Thirteenth, Fourteenth, and Fifteenth Amendments to the Constitution of the United States and implementing federal and state legislation held out to blacks the promise of a dawning era in which the rights and status of the individual and his access to the ever increasing opportunities and privileges of American life would not be demeaned on the basis of race. To the recent slaves and their descendants, even as to immigrants and their descendants, this was to be the land of equality where all could live in dignity, and achievement would not be obstructed by barriers of caste. But less than fifty years later, this lofty promise had been repudiated by national, state, and local government with the sanction of the courts and with the acquiescence of most Americans." [28]

Should Judge Hastie be hereafter disqualified because in this learned article he recognized "[t]hat sordid chapter in American history" [29] where the courts, the national state and local governments failed to assure equal justice under the law? Or would this distinguished jurist and scholar, William H. Hastie, escape disqualification because he is on the Court of Appeals, or because his article was published in a national journal directed to political and social scientists and was not presented primarily to a group of black historians?

Just four weeks ago, Associate Justice Potter Stewart of the United States Supreme Court delivered a most perceptive address at the Yale Law School Sesquicentennial Convocation. He reminisced about his years at the school and noted that from just one "student eating club" in his years there had come " . . . the two members of the Supreme Court who are here today, a United States

27. See n. 28, *infra.*

28. Id. at 19.

29. Id.

Senator, three members of the House of Representatives, two governors of Pennsylvania, two secretaries of the Army, an Undersecretary of Defense, a nominee for the Vice Presidency of the United States, a Vice President of the United States, and the incumbent President of the United States." Many of the alumni present at the Sesquicentennial Convocation were like those in Justice Stewart's student eating club—individuals who are now charting the future course of our society in top policy-making positions. Before this group, Justice Stewart applauded the Yale Law School's great tradition "of free inquiry, of independent thought, and of sceptical examination of the very foundations of existing law." He went on to note:

> "It is in that tradition that I turn this morning to an inquiry into an aspect of constitutional law that has only recently begun to engage the attention of the Supreme Court. Specifically, I shall discuss the role of the organized press—of the daily newspapers and other established news media—in the system of government created by our Constitution.
>
> It was less than a decade ago—during the Vietnam years—that the people of our country began to become aware of the twin phenomena on a national scale of so-called investigative reporting and an adversary press—that is, a press adversary to the Executive Branch of the Federal Government. And only in the two short years that culminated last summer in the resignation of a President did we fully realize the enormous power that an investigative and adversary press can exert.
>
> The public opinion polls that I have seen indicate that some Americans firmly believe that the former Vice President and former President of the United States were hounded out of office by an arrogant and irresponsible press that had outrageously usurped dictatorial power. And it seems clear

that many more Americans, while appreciating and even applauding the service performed by the press in exposing official wrongdoing at the highest levels of our national government, are nonetheless deeply disturbed by what they consider to be the illegitimate power of the organized press in the political structure of our society. *It is my thesis this morning that, on the contrary, the established American press in the past ten years, and particularly in the past two years, has performed precisely the function it was intended to perform by those who wrote the First Amendment of our Constitution. I further submit that this thesis is supported by the relevant decisions of the Supreme Court."* (emphasis added) [30]

I agree with Justice Stewart's assessment of Yale and also of the First Amendment. But my concurrence on these points is irrelevant. The significant fact is that one of the Justices of the United States Supreme Court felt that it was appropriate to speak out on the First Amendment as part of a tradition of "free inquiry, of independent thought, and of sceptical examination of the very foundations of existing law." If it was appropriate for him to discuss such sensitive issues as have confronted the nation within the last ten years against a background of the importance of the First Amendment, then what makes it so inappropriate for a black judge to discuss, before black historians, the nation's racial history under the rule of law?

In view of those comments of Justice Stewart, are defendants suggesting that he should thereafter be disqualified from sitting on first amendment cases, or on other matters tangentially related to the area about which he spoke?

At the luncheon where I spoke, I was introduced by the late Judge Raymond Pace Alexander, senior judge of the Court of Common Pleas of Philadelphia County, and the first black to be ap-

pointed a judge in that court. Because during most of his professional life Judge Alexander has expressed comments similar to those which Judge Hastie made in the *Annals* article, and because of his long association with this scholarly group, the Association for the Study of Afro-American Life and History,[31] and his introduction of me at the banquet, should Judge Alexander have been disqualified from ever hearing a case involving racial claims?

One month to the day after he had introduced me before the Association for the Study of Afro-American Life and History, on November 25, 1974, the city and nation suffered the loss of Judge Alexander. The eulogies were endless and, as *The Philadelphia Inquirer* noted in its lead editorial of November 26, 1974, "His Legacy is a Better City":

"His death at 76 deprives Philadelphia and the nation of an outstanding fighter against racial discrimination who was equally active in promoting good race relations. Judge Alexander believed in brotherhood, and he made true believers of many, black and white, who were privileged to know him."

Judge Alexander's legacy [32] was partially because of the commitment he kept even after he was a judge. Defendants would probably have been the first to applaud that legacy when it was noted on the obituary page. They might even have sent a card of condolence to the family. But they seem to be oblivious to the fact that this legacy was earned by Judge Alexander's participation in the great events of his lifetime, including his frequent speeches to the Association for the Study of Afro-American Life and History.

One of the many gratifying aspects of Chief Justice Burger's leadership of the

---

31. On p. 20 of the souvenir journal, Appendix C, Judge Alexander related the history of the Philadelphia chapter of the Association for the Study of Afro-American Life and History. He began as follows:

"The establishment of the Philadelphia Chapter of the Association for the Study of Negro Life and History (hereinafter, "ASNEH") brings back to my mind some of the many glorious memories of my now rather long and, I must confess, very active life. I look back and see so many truly wonderful people, so many occasions and events that helped shape my own life. Many lovely people, some of whom are no longer living, marked those days in 1929, now forty-one years ago, when we were in correspondence with Dr. Carter G. Woodson and finally when he came to Philadelphia to celebrate the opening of our chapter at an elegant and dramatic meeting in our own home. Dr. Woodson's impressive appearance, his dignified and genteel manner, his culture and eloquence, all interwoven with sincere warmth and simplicity, made it very easy for everyone present to feel his earnestness in the cause of the study of the Black American to which he had devoted his life and to feel entirely 'at home' in his presence."

He noted his service as president of the organization from 1929 to 1933 and his participation in the Association throughout the years. Upon his death Judge Alexander was still active and was an ex officio member of the Executive Council, "having voice and vote." See p. 3 of Appendix B.

32. For a description of Judge Alexander's experiences at the Bar, see Alexander, "Blacks and the Law," 43 N.Y.S.B.J. 15 (1971), reprinted in 43 Pa. B. Ass'n Q. 61 (1971).

At an earlier date, in 1941, before he became a judge, Judge Alexander analyzed the plight of black lawyers within his own profession and argued the necessity of a black bar association as follows:

"Just so long as we are compelled to recognize racial attitudes in America, and the positive refusal to admit the Negro lawyer to membership in the Bar Association of the South or even to permit them to use the libraries just so long as the Negro lawyer is restricted in his membership in local Bar Associations in the North, and particularly, so long as the American Bar Association for all practical purposes refuses to admit Negroes to membership, then so long must there be an organization such as the National Bar Association. Certainly all of us shall welcome the day when racial animosities and class lines shall be so obliterated that separate Bar Associations, other separate professional associations as well as separate schools will be anachronisms."

Alexander, "The National Bar Association —Its Aims and Purposes," 1 Nat'l B.J. 2 (1941). See also "Reflections," 1 BALSA Reports 8 (1973) (reprint of excerpts from Judge Alexander's speech).

federal judicial system has been his intense awareness of the inadequacy of the criminal justice system, particularly as it pertains to corrections, prisons, and jails.

In his penetrating address on the criminal justice system on November 16, 1972, to the National Conference of Christians and Jews, he captioned his speech "Our Options are Limited." He stated:

> "Yet with all this development of the step-by-step details in the criminal adversary process, we continue, at the termination of that process, to brush under the rug the problems of those who are found guilty and subject to criminal sentence. In a very immature way, we seem to want to remove the problem from public consciousness.
>
> \* \* \* \* \* \*
>
> There are, it seems to me, perhaps only two other alternatives.
>
> The first is the obvious one to improve the institutions, the facilities and the programs that are connected with confinement of convicted persons. The second is to develop better means and processes to identify those convicted persons who should not be sent to prisons, but should be released under close supervision. To do this, however, we must expand our supervisory processes and provide intensive training for the men and women in the probation and parole services. Judges and penologists despair over their inability to provide the close supervision that has been found to be one of the most useful devices in the correctional process.
>
> \* \* \* \* \* \*
>
> It should not surprise us, therefore, when a young man from a dismal environment in the first place is found guilty and sentenced for two, three or five years in such an institution, he leaves it a worse, not a better, human being." [33]

Because Chief Justice Burger has taken such a leadership role in bringing enlightenment to our failures in our correctional institutions, should he be disqualified from adjudicating cases where some wardens or parole boards feel that the correctional system has not been faulty, at least in a specific case where a prisoner is asking for relief? [34]

## VIII.

## THE RELEVANCE OF DISSENTING OPINIONS: ". . . an appeal to the brooding spirit of the law, to the intelligence of a future day." [34A]

Was it inappropriate for me to suggest that my audience pursue remedies for inequality in forums other than the Supreme Court? How are the interests of defendants disparaged or hurt when a group of historians or blacks are told they cannot rely on the Supreme Court alone in their pursuit of equality? Such an argument would, if anything, aid defendants rather than prejudice them for it recognizes the limited powers of the judiciary as an instrumentality to eradicate some aspects of racial injustice.

Moreover, this view of the limited extent to which blacks can rely on the Court is not original with me. Justice Thurgood Marshall, in the *Bradley* case, was joined in his dissent by Justices Douglas, Brennan and White.[35] He said:

> "After 20 years of small, often difficult steps towards that great end [a living truth of our constitutional ideal of equal justice under the law], the Court today takes a giant step backwards . . . the Court's answer is to provide no remedy at all for the violation proved in this case, thereby guaranteeing that Negro children in Detroit will receive the same separate

---

33. Pp. 4–5, 6–7, 8 (emphasis added).

34. See Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

34A. C. Hughes, *The Supreme Court of the United States* 67–68 (1928).

35. Milliken v. Bradley, 418 U.S. 717, 781, 94 S.Ct. 3112, 3145, 41 L.Ed.2d 1069 (1974).

and inherently unequal education in the future as they have been unconstitutionally afforded in the past. . . . Those children who have been denied that right in the past deserve better than to see fences thrown up to deny them that right in the future. Our nation, I fear, will be ill-served by the Court's refusal to remedy separate and unequal education, for unless our children begin to learn together, there is little hope that our people will ever learn to live together." [36]

Defendants cannot seriously contend that it is improper to quote with approval the dissenting opinions of Supreme Court Justices. Time and again, in rejecting legal conclusions that appeared obvious to a majority of their contemporaries on the Court, dissenting Justices have shown themselves to be true prophets, predicting with uncanny accuracy the course the law would eventually take. Mr. Chief Justice Hughes phrased it well:

"A dissent in a court of last resort is an appeal to the brooding spirit of the law, to *the intelligence of a future day*, when a later decision may possibly correct the error in which the dissenting judge believes the court to have been betrayed." (emphasis added)[37]

The history of the Supreme Court is studded with examples of the prescience of dissenting Justices.

In Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), the Supreme Court struck down on due process grounds a statute prohibiting bakery workers from toiling for more than sixty hours a week. Mr. Justice Holmes, in a classic dissent, pointed out that "[t]he 14th Amendment does not enact Mr. Herbert Spencer's Social Statics," and that "[the] Constitution is not intended to embody a particular economic the-

ory." [38] Thirty-two years later Justice Holmes was vindicated when the *Lochner* doctrine was finally discarded in West Coast Hotel Co. v. Parrish, 300 U. S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937). In Hammer v. Dagenhart, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101 (1918), the court struck down a Congressional statute prohibiting the shipment in interstate commerce of goods produced by child labor. Again, Mr. Justice Holmes dissented, and again his view eventually became the law, this time in United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941), which expressly overruled Hammer v. Dagenhart, *supra*.

In First Amendment cases, Mr. Justice Brandeis joined Mr. Justice Holmes to form an immortal tandem of dissenters. Theirs was the minority view in Abrams v. United States, 250 U.S. 616, 40 S.Ct. 17, 63 L.Ed. 1173 (1919), and Gitlow v. New York, 268 U.S. 652, 45 S. Ct. 625, 69 L.Ed. 1138 (1925). Not long afterwards, however, the values they had championed were endorsed by the Court in Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), in Herndon v. Lowry, 301 U.S. 242, 57 S. Ct. 732, 81 L.Ed. 1066 (1937), in Palko v. Connecticut, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937), and in Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938).

Both men were in the minority again in Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), where they voiced their objection to federal invasions of individual privacy through wiretapping. In his dissent, Mr. Justice Brandeis gave classical expression to the philosophical foundation of the Fourth Amendment:

"Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the [ordinary] citizen. In a government of

36. Id. at 3145–46.

37. C. Hughes, *The Supreme Court of the United States* 67–68 (1928).

38. Id. at 75, 25 S.Ct. at 546, 547.

laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy." [39]

This "appeal to the brooding spirit of the law" fond an answering echo in United States v. United States District Court, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), where the Supreme Court unanimously rejected the Federal Government's claim that it could conduct warrantless electronic surveillance in matters of domestic security.

· The dissenting opinion of Mr. Justice Black in Adamson v. California, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947), presaged the expansive view of rights entitled to Fourteenth Amendment protection that was later reflected in landmark criminal procedure decisions like Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Finally, the first Mr. Justice Harlan stood alone in Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), when he said that

" . . . in view of the constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens. There is no caste here. Our constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law. The humblest is the peer of the most powerful. The law regards man as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved." [40]

Fifty-eight years later, in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Supreme Court unanimously adopted the message of Mr. Harlan's dissent that the states cannot impose racial segregation.[41]

Surely, then, there was no impropriety in my reliance, in a public forum, on Mr. Justice Marshall's appeal to "the intelligence of a future day," his dissent in Milliken v. Bradley, *supra,* unless defendants believe that a Supreme Court Justice may make such an appeal, but a District Court Judge may not. Or do defendants believe that all opinions of the majority during the October, 1973 Supreme Court term are eternal verities and that it is heresy to hereafter quote one of the dissenting Justices?

---

39. Id. at 485, 48 S.Ct. at 575.

40. Id. at 559, 16 S.Ct. at 1146.

41. While he did not cite Justice Harlan's dissenting opinion, nevertheless, when a state judge and chancellor in Belton v. Gebhart, 32 Del.Ch. 343, 87 A.2d 862 (Del.1952), Chief Judge Seitz adopted as his own personal belief the rationale which Justice Harlan had expressed in his dissent in Plessy v. Ferguson. *Belton, supra,* later became one of the four companion cases in Brown v. Board of Education, see 347 U.S. 483, 486 n. 1 and 494 n. 10, 74 S.Ct. 686. As chancellor, Judge Seitz wrote:

" . . . In other words, by implication, the Supreme Court of the United States has said a separate but equal test can be applied, at least below the college level. This Court does not believe such an implication is justified under the evidence. Nevertheless, I do not believe a lower court can reject a principle of United States Constitutional law which has been adopted by fair implication by the highest court of the land. *I believe the 'separate but equal' doctrine in education should be rejected,* but I also believe its rejection must come from that Court." 87 A.2d at 865 (emphasis added)

Thus, in 1952, by reason of his definitive statement that he believed the "separate but equal" doctrine in education should be rejected, Judge Seitz's comment might be the equivalent of Justice Harlan's classic dissenting opinion, and of course that belief was no basis for disqualifying him to decide the case on its merits.

## IX.

### THE OLD AND NEW ORDER OF THINGS

If, for the reasons previously discussed, defendants' motions are meritless, and since the motions are presumably filed in good faith, what other rationale could explain why defendants so vehemently assert their claim that I be disqualified in the instant case? Perhaps, among some whites, there is an inherent disquietude when they see that occasionally blacks are adjudicating matters pertaining to race relations, and perhaps that anxiety can be eliminated only by having no black judges sit on such matters or, if one cannot escape a black judge, then by having the latter bend over backwards to the detriment of black litigants and black citizens and thus assure that brand of "impartiality" which some whites think they deserve.

Since 1844, when Macon B. Allen became the first black lawyer to be admitted to the bar of any state,[42] and since John S. Rock was admitted to the bar of the United States Supreme Court on February 1, 1865,[43] black lawyers have litigated in the federal courts almost exclusively before white judges, yet they have not urged that white judges should be disqualified on matters of race relations. In fact, in the "good old days" before William H. Hastie was appointed in 1949 to the United States Court of Appeals for the Third Circuit, white litigants throughout America were able to argue before a judiciary from the United States District Courts to the Courts of Appeals to the United States Supreme Court without encountering a single black judge along the entire judicial route; for until Judge Hastie's appointment there were no black Article III judges.[44] In fact, until 1961, white litigants in the United States District Courts never had to ponder the subtle issue which defendants now raise, because no President had ever appointed a black as a United States District Judge. If blacks could accept the fact of their manifest absence from the federal judicial process for almost two centuries, the plain truth is that while litigants are now going to have to accept the new day where the judiciary will not be entirely white and where some black judges will adjudicate cases involving race relations.

Interestingly enough, in my almost eleven years on this court, Abraham Freedman and his law firm, Freedman, Borowsky and Lorry, representing claimants and members of the National Maritime Union and the International Longshoremen's Union, have appeared before me on hundreds of occasions. Often they were representing black seamen and black longshoremen. In the process, they have obtained verdicts and blacks which cumulatively involve millions of dollars for the litigants and millions of dollars in fees for their law

42. Walter J. Leonard, "The Development of the Black Bar," 407 Annals 134, 136 (1973).

43. Fitzhugh Lee Styles, Negroes and the Law 14 (1937).

44. Judges in the United States District Courts, Courts of Appeal and Supreme Court are appointed pursuant to Article III of the United States Constitution. They are nominated by the President and approved by the Senate and have lifetime tenure. See generally, Charles Allen Wright, Law of Federal Courts, Chapter I (1970). Before Judge Hastie's appointment to the United States Court of Appeals, a few blacks had been appointed to the federal bench as territorial judges as in the Virgin Islands, or as judges in the local courts of Washington, D. C. In fact, on his appointment in 1937, to the territorial court in the Virgin Islands, Judge Hastie was the first black to have ever been appointed as a territorial judge. For a more detailed analysis, see the unpublished monograph of Charisse Lillie, "The Careers of the Black Lawyers Who Have Become Federal Judges" (May 1973) (on file at Wesleyan University, Department of Government); Report on Black Lawyers and Judges in the United States, 1960–1970, by Edward V. Toles, Congressional Record E–7996, September 2, 1970; and The Black Judge in America: A Statistical Profile, a special society report, American Judicature Society, Vol. 57, p. 18. See also the forthcoming book of Professor Gilbert Ware of Drexel University, Voices from the Black Bench, to be published in 1974.

firm. The rationale on which they now proceed, if valid, would constitute a basis for disqualifying me and every other black judge in the nation who sits on any of the maritime cases which they litigate here and nationally, because these cases frequently turn on a contested issue of credibility between the allegations of negligence or unseaworthiness by the black seaman or longshoreman and the contrary allegations of the stevedore or maritime officer (who most often are white). Why should black judges be qualified to sit when defendants' present counsel are collecting millions of dollars in legal fees from black seamen and longshoremen, but become instantly disqualified to sit when a predominantly white union represented by the same law firm is charged with racial discrimination?

There is even a more subtle aspect to defendants' argument. It would appear to stem from their possibly subconscious expectations of a black judge's image. They seem highly agitated by the fact that a black judge, with some knowledge of the history of his people, has received sufficient recognition to be invited to speak to a group of black historians. They contend that for him to accept the invitation is to breach his impartiality. Thus, in effect, they are arguing that a black judge cannot convince some whites that he possesses the requisite impartiality unless he shuns associations of black scholars and, *a fortiori*, never speaks to them. Thus by the subtle tone of their objection, they demonstrate either that they want black judges to be robots who are totally isolated from their racial heritage and unconcerned about it, or, more probably, that the impartiality of a black judge can be assured only if he disavows, or does not discuss, the legitimacy of blacks' aspirations to full first class citizenship in their own native land. Again, in the good old days, it was possible to find a retinue of colored leaders who by their speeches, their actions, and their public declarations assured whites, and more specifically the white power structure, that the colored man would not rock the boat on what whites perceived to be their sea of racial tranquility.

Though a complex man who made many notable contributions to the advancement of black people, Booker T. Washington [45] symbolized the "we won't rock the boat" attitude in his famous Atlanta speech, where he said:

*"It is at the bottom of life we must begin, and not at the top.* Nor should we permit our grievances to overshadow our opportunities. . . .

"While doing this, we can be sure in the future, as in the past, that you and your families will be surrounded by the most patient, faithful, law-abiding, and unresentful people that the world has seen. As we have proved our loyalty to you in the past, in nursing your children, watching by the sick bed of your mothers and fathers, and often following them with tear-dimmed eyes to their graves, so in the future, *in our humble way*, we shall stand by you with a devotion that no foreigner can approach, ready to lay down our lives, if need be, in defense of yours, interlacing our industrial, commercial, civil, and religious life with yours in a way that

---

45. In no way am I here attempting to denigrate Booker T. Washington. Perhaps for his time, considering the magnitude of the opposition he faced, "moderation" was the only alternative. But see the writings of W. E. Burghardt DuBois, The Souls of Black Folk (1903). See also John Hope Franklin's perceptive analysis of DuBois and Booker T. Washington in his introduction to Three Negro Classics (Discus Ed. 1970): "W. E. B. DuBois recognized [Booker T. Washington's] strength but seriously questioned his wisdom and even his integrity. Perhaps the thing that disturbed DuBois most was what he later called 'the Tuskegee Machine,' manifested in the power that Washington enjoyed in determining the future course of Negroes in general as well as the careers of individual Negroes." Id. at xi. Dr. Franklin had earlier pointed out that "William Monroe Trotter, fiery editor of the *Boston Guardian*, regarded Washington as a traitor to his race."

shall make the interests of both races one. In all things that are purely social *we can be as separate as the fingers,* yet one as the hand in all things essential to mutual progress." [46]

When Washington said "[i]n all things that are purely social, we can be as separate as the fingers," he defined as "social" some areas which are now classically considered civil rights. Because of the priorities he deemed essential, Washington seemed to imply that blacks would not vigorously oppose state-imposed segregation, or their exclusion from some public accommodations, and that they would not protest against state-imposed racial segregation in public schools. Some thought that Washington may even have meant that blacks would not strongly protest their disenfranchisement in the political arena.[46a] The classic analysis of Booker T. Washington has been given by Louis R. Harlan, who noted:

"The right to vote was symbolic of the new life of black people during Reconstruction. The denial of the vote on account of race and the deepening of segregation became the central symbolic acts of a white counter-revolution that followed Reconstruction. Booker T. Washington in his Atlanta Compromise address, and in many actions that preceded and followed it, denied the centrality of disfranchisement and segregation, and emphasized economic advancement and self-help as the route through the wilderness to the black man's promised land. In state after state, year after year, disfranchisement of black voters by formal action marched across the South. In the quarter-century after Mississippi began the movement in 1890, every former Confederate state officially disfranchised black voters by a variety of devices that the federal courts and Congress permitted despite the Reconstruction amendments. Disfranchisement repeatedly appeared as a public issue testing Washington's leadership and sense of direction as a black Moses. The way he responded publicly confirmed and deepened his role, not as a total accommodator who made his peace with injustice, but as a conservative who would seek for himself and his people what he wanted but would take what he could get." [47]

There is, however, a new generation of blacks in the 1970's who do not accept Booker T. Washington's analysis that "[i]t is at the bottom of life we must begin . . ." as the model for the conduct of blacks in this decade. For they know that despite his deference, despite his care not to offend the then hostile white political structure, he could not mollify those who insisted that blacks accept second-class citizenship. On the contrary, such acquiesence was interpreted to mean that blacks were content with being three-fifths of a man. [47a] Further, blacks are aware of

---

46. Louis R. Harlan, ed. *The Booker T. Washington Papers, Vol. I, The Autobiographical Writings,* 74–75 (1972) (emphasis added).

46a. In that same Atlanta speech, Washington said, "It is important and right that all privileges of the law be ours, but it is vastly more important that we be prepared for the exercise of those privileges. The opportunity to earn a dollar in a factory just now is worth infinitely more than the opportunity to spend a dollar in an opera house." Id. at 76. Many have construed the reference to the opera house by Washington as an effort to allay the fears of some that blacks were insisting upon integration in some public accommodations. As the question of disenfranchisement, see L. Harlan, *Booker T. Washington, The Making of a Black Leader, 1856–1901,* Chapter 15, "Dark Clouds and Silver Linings" (1972).

47. Louis R. Harlan, *Booker T. Washington, The Making of a Black Leader, 1856–1901,* 288 (1972).

47a. The word "slavery" never appeared in the original Constitution of 1787 and did not appear, even in the amendments, until the Thirteenth Amendment abolished slavery. However, the framers did use the term "three-fifths of all other Persons" in Article 1, § 2 of the original Constitution as a synonym for slavery. See A. L. Higginbotham, Race and the American Legal Process, unpublished monograph, Chapter V, and D. L. Robinson, *Slavery in the Structure of American Politics,* Chapter V (1971).

the sequel to Booker T. Washington's deference. For when he informally had lunch with President Theodore Roosevelt, Loren Miller has noted that:

"The Memphis Scimitar said, 'The most damnable outrage which has ever been perpetrated by any citizen of the United States was committed yesterday by the President, when he invited a nigger to dine with him at the White House.' Senator Benjamin Tillman of South Carolina said, 'Now that Roosevelt has eaten with that nigger Washington, we shall have to kill a thousand niggers to get them back to their places.' Georgia's governor was sure that 'no Southerner can respect any white man who would eat with a Negro.'

\* \* \* \* \* \*

The ultimate obscenity was sponsored by Governor James K. Vardaman of Mississippi, in his newspaper: 'It is said that men follow the bent of their geniuses, and that prenatal influences are often potent in shaping thoughts and ideas in after life. Probably old lady Roosevelt, during the period of gestation, was frightened by a dog, and that fact may account for the qualities of the male pup that are so prominent in Teddy. I would not do either an injustice, but am disposed to apologize to the dog for mentioning it.' There was more much more, in the same scurrilous vein by newspapers, officeholders and southern politicians." [48]

## X.

### THE ROLE OF JUDGES

Thus, the critical issue is, what conduct by black judges will assure their impartiality? Should they be robots? Should they demean their heritage by asking for less than first class citizenship for other blacks? Should they not tell the truth about past injustices? Of course, there is a dramatic difference between the role which legislators, politicians, and elected officials play in our society, one which is far closer to the cutting edge of policy development, and the role which could be tolerated or expected from a federal judge. I willingly accept those limitations; they are inherent in the judicial process. I am aware that Judge Higginbotham is not Senator Higginbotham, or Mayor Higginbotham, or Governor Higginbotham, but I also know that Judge Higginbotham should not have to disparage blacks in order to placate whites who otherwise would be fearful of his impartiality.

Obviously, black judges should not decide legal issues on the basis of race. During my ten years on this court, I have not done so. I have, depending on the facts, sentenced numerous black and white criminal defendants to substantial terms of imprisonment. I have placed other criminal defendants, both black and white, on probation. Depending on the relevant facts, some civil cases have been decided in favor of and others against black litigants. In this case, plaintiffs similarly will enjoy no advantage because they are black; defendants will not be disadvantaged because some of them are white. The outcome of this case will be dictated by what the evidence shows, not by the race of the litigants.

I am pleased to see that my distinguished colleagues on the bench who are Jewish serve on committees of the Jew Community Relations Council, on the boards of Jewish publications, and are active in other affairs of the Jewish community. I respect them, for they recognize that the American experience has often been marred by pervasive anti-Semitism. I would think less of them if they felt that they had to repudiate their heritage in order to be impartial judges.

Many Catholic judges have been active in their church, as have been Episcopali-

<hr>

48. Loren Miller, *The Petitioners: The Story of the Supreme Court of the United States and the Negro*, 206–207 (1966).

an and other Protestant judges. It would be a tragic day for the nation and the judiciary if a myopic vision of the judge's role should prevail, a vision that required judges to refrain from participating in their churches, in their non-political community affairs, in their universities. So long as Jewish judges preside over matters where Jewish and Gentile litigants disagree; so long as Protestant judges preside over matters where Protestants and Catholic litigants disagree; so long as white judges preside over matters where white and black litigants disagree, I will preside over matters where black and white litigants disagree. Defendants are patently aware of the variety of extra-judicial activities which has been the accepted standard for judges in this District Court, in this circuit, and in the nation. It is inconceivable, then, that rational lawyers would object to the aforementioned speeches made by Chief Justice Burger and Justice Stewart, or even the speech which Justice Douglas made on December 2, 1974, to the Jewish Community Relations Council of Philadelphia.

I concluded my address to the historians by quoting Langston Hughes' famous poem "Dream of Freedom":

"THERE IS A DREAM IN THE LAND

WITH ITS BACK AGAINST THE WALL,

BY MUDDLED NAMES AND STRANGE

SOMETIMES THE DREAM IS CALLED.

THERE ARE THOSE WHO CLAIM THIS DREAM FOR THEIRS ALONE—

A SIN FOR WHICH, WE KNOW, THEY MUST ATONE.

UNLESS SHARED IN COMMON

LIKE SUNLIGHT AND LIKE AIR, THE DREAM WILL DIE FOR LACK OF SUBSTANCE ANYWHERE.

THE DREAM KNOWS NO FRONTIER OR TONGUE

THE DREAM NO CLASS OR RACE, THE DREAM CANNOT BE KEPT SECURE

IN ANY ONE LOCKED PLACE.

THIS DREAM TODAY EMBATTLED,

WITH ITS BACK AGAINST THE WALL—

TO SAVE THE DREAM FOR ONE IT MUST BE SAVED FOR ALL."

In a nation which had a revolution theoretically based on the declaration that "we hold these truths to be self-evident, that all men are created equal," a judge should not be disqualified if two centuries later he believes that the rhetoric must be made real for all citizens, including blacks, and that the dream must be "saved for all."

## CONCLUSION

In many ways this opinion may appear to be too long and prolix. But if defendants' arguments are asserted in good faith and sincerity, they nevertheless represent an almost subconscious expression of their expectation of the deportment of blacks and, more specifically, of black judges. If America is going to have a total rendezvous with justice so that there can be full equality for blacks, other minorities, and women, it is essential that the "instinct" for double standards be completely exposed and hopefully, through analysis, those elements of irrationality can be ultimately eradicated. It is regrettable that in this case I must take substantial time and effort to answer defendants' meritless allegations, but in some respects the motions merely highlight the duality of burdens which blacks have in public life. Blacks must meet not only the normal obligations which confront their colleagues, but often they must spend extraordinary amounts of time in answering irrational positions and assertions

before they can fulfill their primary public responsibilities.

My remarks to the Association for the Study of Afro-American Life and History on October 25, 1974 are the factual foundation for defendants' motions. Those remarks reflected a position similar to the one which that distinguished federal jurist from South Carolina, Judge Waring,[49] once took in behalf of equal racial justice. My remarks, like his, showed "at most, zeal for upholding the rights of Negroes under the Constitution and indignation that attempt should be made to deny them their rights. A judge cannot be disqualified merely because he believes in upholding the law, even though he says so with vehemence." Baskin v. Brown, *supra*, 174 F.2d at 394.

Of course, I do have feelings that this nation must fulfill its theoretical commitment to equal justice under the law. I do not apologize for these feelings, nor do I apologize for my remarks. Given the same opportunity, I would make those remarks again today. If I had not in fact made them, I would wish that I had.

Defendants' Motions for Disqualification are denied.[50]

---

49. Judge Waring wrote the dissenting opinion in the three-judge court which initially heard Briggs v. Elliot, 98 F.Supp. 529, 538 (D.C.1951). He noted that in his view Plessy v. Ferguson was no longer valid constitutional doctrine and concluded "To me the situation is clear and important particularly at this time when our national leaders are called upon to show to the world that our democracy means what it says and that it is a true democracy and there is no under-cover suppression of the rights of any of our citizens because of the pigmentation of their skins." Id. at 548. He had earlier said that "if the courts of this land are to render justice under the laws without fear or favor, justice for all men and all kinds of men, the time to do it is now and the place is in the elementary schools where our future citizens learn their first lesson to respect the dignity of the individual in a democracy." Id.

50. I cannot in good conscience certify this question of law to the Court of Appeals for its judgment pursuant to 28 U.S.C. § 1292(b) (1970). The applicable law clearly permits me to continue to preside over the instant case. I recognize, however, that should defendants deem it appropriate, they may apply to the Court of Appeals for a writ of mandamus or prohibition, and ultimately carry this question to the Supreme Court of the United States if the Court of Appeals does not grant their application. While I am confident that my determination of the disqualification issue is correct, if such writs were pursued I would refrain from further proceedings until there was a definite ruling by the Court of Appeals. Such a delay would be unfortunate, since this case is three years old and probably the oldest triable case on my docket. But because of the personal nature of these motions, I would await appellate determination if such writs were sought.